CALIFORNIA GAS PRODUCERS ASSOCIATION, Independent Oil and Gas Producers of California, and Jade Oil and Gas Company, the State of Texas, Texas Independent Producers & Royalty Owners Association, West Central Texas Oil and Gas Association, and Permian Basin Petroleum Association, Petitioners,

v.

FEDERAL POWER COMMISSION, Respondent,

Pacific Gas Transmission Company, Public Utility Commissioner of Oregon, City and County of San Francisco, and Southern California Gas Company, Southern Counties Gas Company of California, and Pacific Lighting Service and Supply Company, Intervenors.

Nos. 21310, 21313, 21314.

United States Court of Appeals
Ninth Circuit.

Sept. 15, 1967.

Henry F. Lippitt, II, Los Angeles, Cal., for petitioners, California Gas Producers Assn., Independent Oil & Gas Producers of Cal., and Jade Oil & Gas Co.

Waggoner Carr, Atty. Gen. of Texas, Hawthorne Phillips, First Asst. Atty Gen., T. B. Wright, Executive Asst. Atty. Gen., J. Arthur Sandlin, C. Daniel Jones, Jr., Linward Shivers, Asst. Attys. Gen., Crawford C. Martin, Atty. Gen. of Texas, George M. Cowden, First Asst. Atty. Gen., A. J. Carrubi, Jr., Staff Legal Asst. Atty. Gen., Houghton Brownlee, Jr., Asst. Atty. Gen., Austin, Tex., for petitioner, State of Texas.

John Davenport, Austin, Tex., for petitioners, Texas Independent Producers & Royalty Owners Assn., West Central Texas Oil & Gas Assn., and Permian Basin Petroleum Assn.

Richard A. Solomon, Gen. Counsel, Howard E. Wahrenbrock, Sol., Peter H. Schiff, Deputy Sol., Federal Power Commission, Washington, D. C., for respondent.

Robert Y. Thornton, Atty. Gen., Richard W. Sabin, Asst. Atty. Gen., Salem,

Or., for intervenor, Public Utilities Comr. of Or.

Thomas M. O'Connor, City Atty., William F. Bourne, Public Utilities Counsel, William C. Taylor, Deputy City Atty., Robert R. Laughead, San Francisco, Cal., Chief Valuation & Rate Engineer, City & County of San Francisco, for intervenor, City & County of San Francisco.

Malcolm H. Furbush, Richard H. Peterson, John A. Sproul, San Francisco, Cal., Raymond N. Shibley, Washington, D. C., for intervenor, Pacific-Gas Transmission Co.

John Ormasa, Roger J. Nichols, Eric W. Martens, Los Angeles, Cal., for intervenors, Southern California Gas Co., Southern Counties Gas Co., of Cal., and Pacific Lighting Service & Supply Co.

L. Dan Jones, Gen. Counsel, William I. Powell, Asst. Gen. Counsel, Washington, D. C., for amicus curiae, Independent Petroleum Assn. of America.

Before MERRILL and DUNIWAY, Circuit Judges, and MATHES,* District Judge.

DUNIWAY, Circuit Judge:

These are petitions under the Natural Gas Act, 15 U.S.C. §§ 717–717w, to review an order of the Federal Power Commission. By that order, which was issued June 15, 1966, the Commission authorized Pacific Gas Transmission Company (P.G.T.) a natural gas pipeline company previously authorized, on August 5, 1960, to bring natural gas from Canada to California (see Pacific Gas Transmission Co., 1960, 24 FPC 134), to import an additional 100,000 Mcf (thousand cubic feet) per day beginning November 1, 1966, and a further 100,000 Mcf per day beginning November 1, 1967. The gas is to be imported for transportation and sale to Pacific Gas and Electric Company (P.G. & E.) in California.

The petitioners in No. 21,310 are California Gas Producers Association, Independent Oil and Gas Producers Association of California and Jade Oil and Gas Company (the California Producers). The members of the Associations, like Jade, produce and sell natural gas in California. The petitioner in No. 21,313 is the State of Texas. We think it fair to say that that state is here acting in what it believes to be the interest of Texas natural gas producers. The petitioners in No. 21,314 are Texas Independent Producers and Royalty Owners Association, West Central Texas Oil & Gas Association and Permian Basin Petroleum Association (collectively TIPRO). They represent approximately 7500 producers and royalty owners of crude oil and natural gas, primarily in Texas. All of the petitioners are supported by the Independent Petroleum Association of America as amicus curiae. It is an Oklahoma corporation, a national trade association representing independent oil and natural gas producers.

Opposing the petitions, in addition to the Commission itself and P.G.T., are Southern California Gas Company, Southern Counties Gas Company and Pacific Lighting Service and Supply Company (collectively, the Southern California Companies), public utilities buying and distributing natural gas in Southern California. The territory they serve is contiguous to that of P.G. & E., which serves Northern California. They have interconnections of their pipeline systems with that of P.G. & E. and one of them is buying some gas from P.G. & E. Also opposing are the Public Utilities Commissioner of Oregon and the City and County of San Francisco, on behalf of natural gas consumers in their respective areas.

The order of August 5, 1960, authorized P.G.T. to construct and operate a 614 mile 36-inch pipeline from British Columbia to the California border. That line is part of a 1400 mile line bringing gas from the producing fields of Alberta

---

* Senior District Judge William C. Mathes, sitting by designation, died on July 24, 1967. He participated in the hearing and consideration of this case and expressed his concurrence in the result that we reach. He did not participate in the preparation of this opinion.

to Northern California and the Northwest. The effect of the order was to permit P.G.T. to deliver 415,000 Mcf of gas per day to P.G. & E. and 100,000 Mcf per day to El Paso Natural Gas Company (El Paso) for delivery to customers in the Northwest. The order now under review authorizes the bringing in of more gas via that line.

We find the situation here somewhat unusual. Attacking the order, primarily on the ground that it does not sufficiently protect California consumers, are three groups of producers and a producing state; supporting it are California utilities that serve California consumers and two public bodies appearing on behalf of consumers. One could hardly fault the Commission if it took some of the petitioners' contentions with a small grain of salt.

We consider the three petitions together; many of the contentions are made by several petitioners. In doing so, we have in mind two basic rules. The first, appearing in the Act itself, is that "[t]he finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." (§ 19(b), 15 U.S.C. § 717r(b)). The second is that we owe the Commission "the same deference to its expertise that courts generally owe to the specialized boards and commissions created by the Congress to deal with complex and difficult problems in the field of economic regulation." (People of State of California v. FPC, 9 Cir., 1965, 353 F.2d 16, 23). This is particularly true here, where the Commission was deciding, first, whether to issue a certificate of public convenience and necessity under section 7(c) (15 U.S.C. § 717f(c)) and second, whether the proposed importation of gas "will not be consistent with the public interest," under section 3 (15 U.S.C. § 717b). It has been said that "[t]he granting or denial of a certificate of public convenience and necessity is a matter peculiarly within the discretion of the Commission." (Oklahoma Natural Gas. Co. v. FPC, 1958, 103 U.S.App.D.C. 256, 257 F.2d 634, 639; see also the remarks of

Judge Hutcheson in CIA Mexicana De Gas, S.A. v. FPC, 5 Cir., 1948, 167 F.2d 804, 806). Congress has vested considerable discretion in the Commission; the burden is upon petitioners to show that it has been abused.

Texas, supported by TIPRO, urges that the Commission erred in treating this case, which deals with an application to make fuller use of an already certificated and constructed facility, in a manner somewhat different from the way in which it might treat an application relating to a new facility. The Hearing Examiner, whose decision was approved by the Commission, observed:

"The various regulatory agencies recognized, when they authorized the construction and operation of this 36-inch line, that it was oversized for the throughput of the initially certificated volumes of 415,000 Mcf per day. However, PGT there indicated that future authorizations would be sought to import additional volumes of natural gas to utilize the full capacity of the line."

The Commission said.

"We are concerned here with already existing pipeline facilities which are not yet being utilized to their fullest capacity. The increased use of the existing pipeline facilities will reduce the unit cost of the gas supplied to California and will also reduce the unit cost of transportation of gas transported for El Paso and destined for the consumers in Washington, Oregon and Idaho. To refuse to issue certificates authorizing the importation, transportation, and sale of this additional gas would mean that some of the capacity of presently existing facilities would remain unused with resultant higher costs to the consumers in four states."

We see nothing arbitrary or capricious, no abuse of discretion, in such an approach to the present problem. The Commission, in the 1960 proceeding, found that the construction of the facility was consistent with public convenience and necessity, and that the im-

portation of the gas then permitted was consistent with the public interest. The facility has been built; the gas is being imported. These are facts, and they are among the most important facts underlying this proceeding. If the quantity needed has increased by 50% and if that additional quantity can be brought in at comparatively little additional capital cost (about $13,000,000 compared to $116,000,000 cost of the facility), and if doing so will reduce the unit cost of the total amount of gas flowing through the facility, what possible reason is there for not considering these results to be of great importance here? Much of Texas' attack is really on the 1960 order, which it did not then oppose, and cannot now attack.[1]

■■ The California Producers and TIPRO argue that the Commission's finding that a market exists for the additional gas to be imported is not supported by the evidence. We do not agree. The attack of the California Producers is primarily upon P.G. & E.'s estimates of available supply from California sources. But the Hearing Examiner found, and the record shows, that even if P.G. & E.'s estimates were in this respect too low, the demand for gas from its customers plus its need for gas for use in its own electric generating plants, would still exceed the available supply, including that coming from California Producers. TIPRO's argument is a little different—it says that, even without the new gas, P.G. & E.'s "interruptible" gas customers would not be cut off through 1969. But this ignores P.G. & E. itself as an interruptible customer. We think that the Commission could consider P.G. & E.'s needs as well as those of other industries that it serves. We also think that it is for the Commission, not this court, to weigh the accuracy of the estimates of California production made by the parties, and that the record contains substantial evidence to support the finding.

■ The second argument, made by all petitioners, is that the Commission did not give adequate consideration to the possible availability of sufficient gas to supply P.G. & E.'s needs from domestic sources. These sources are said to be, first, California production, and second, the Texas-Permian Basin-New Mexico area. But, as has already been noted, the Commission did fully consider California production.

As to the other source, the argument is predicated primarily upon the assumption that El Paso Natural Gas Company could have supplied comparable quantities of gas and at as low or lower prices. This contention was not put forward by El Paso, which was an intervenor before the Commission. On the contrary, its counsel stated at the hearing: "We are not—we have no application on file, we have no unfilled capacity by which we could furnish any additional gas supplies to Pacific Gas and Electric Company." In effect, petitioners volunteered El Paso as the supplier. We have some doubt that the Commission was under any duty to consider this supposed source, in view of El Paso's position. As the record shows, El Paso then had pending before the Commission an application for a certificate that would authorize it to supply additional gas to the Southern California area. See Transwestern Pipe Line Company, et al., FPC, opinion No. 500, FPC July 26, 1966, commonly known as the "Gulf Pacific" case.

The cases cited by petitioners, we think, are not directly in point on this question. See Scenic Hudson Preservation Conference v. FPC, 2 Cir., 1965, 354 F.2d 608, 612; Michigan Consol. Gas Co. v. FPC, 1960, 108 U.S.App.D.C. 409, 283 F.2d 204, 224; City of Pittsburgh v. FPC, 1956, 99 U.S.App.D.C. 113, 237 F.2d 741, 751–753.

■ But the Commission did consider the alternative.[2] And surely, in doing

---

1. None of the present petitioners opposed the 1960 order.

2. It assumed that there was sufficient production available in the Texas-Permian Basin-New Mexico area to provide the additional gas. Thus exclusion of testimony to that effect, if error, was harmless.

so, it was proper for it to take into account the willingness of El Paso to undertake the suggested alternative method of supply. Unless the proffered alternative is really available, there would seem to be little point in considering it. Section 7(e) of the Act, 15 U.S.C. § 717f(e) requires that an applicant for a certificate be both able and willing to undertake the task. There are other pertinent factors. El Paso supplies large quantities of gas, both to P.G. & E. and to the Southern California companies. The suggested alternative was predicated on testimony prepared for use in the pending Gulf Pacific case in which El Paso proposed, through its existing facilities or the construction of new ones, or both, to increase its gas supply to the Southern California area. Both Southern California and Northern California are areas of rapid growth in population and in demand for natural gas. El Paso serves them both. It has been supplying about 70% of P.G. & E.'s out of state gas. The substance of the suggested alternative would appear to be to switch part of the additional gas proposed to be supplied from Southern California to Northern California. No doubt the Commission can consider such a suggestion. But it might reasonably conclude that it was better not to do so, but to certificate the additional gas for Southern California and to take care of some of Northern California's needs by a supply of additional gas from Canada via PGT's existing facilities. As the Commission says in its opinion: "[t]he record in this case does not demonstrate that alternative methods exist for providing the needed volumes of additional gas at rates and under conditions more advantageous that those which can be achieved by certification of PGT's instant application."

■ Petitioners say, however, that the Commission really did not consider the question because it rejected their proffered evidence and declined to subpoena a witness proffered by them, Hunsaker, an El Paso employee. It did, however, permit the petitioners to make an offer of proof, pursuant to its rules (18 C.F.R. § 1.28(b)).[3] If it be assumed that the evidence should have been received, and if nevertheless, taken at face value it does not show what petitioners say it does, then we cannot say that the Commission erred in excluding it.[4] The proffered evidence does not show what the cost to P.G. & E. of the alternative supply would be. Before the Examiner and the Commission, Texas asserted that Hunsaker's testimony would show that El Paso could supply the gas, and that it could do so at a lower cost to P.G. & E. However, when the Examiner declined to receive the testimony and declined to subpoena Hunsaker, but indicated that Texas should make an offer of proof, the offer made said nothing at all about the cost of the gas to P.G. & E. It dealt only with a description of various methods that El Paso might use to supply gas at the California border, and the capital cost of the facilities that El Paso would have to build.

The Commission's rules as to what an offer of proof must be are quite specific:

"(b) *Offers of proof.* Any offer of proof made in connection with an objection taken to any ruling of the pre-

---

3. In refusing to overrule the Examiner's decision to exclude the proffered evidence, the Commission said:

"We note that the movants, with the approval of the examiner, have made an offer of proof with respect to the testimony which is the subject of the motion. It will be available for our consideration when the case comes before us for decision."

This language indicates to us that, when the Commission speaks of "the record in this case," it includes in "the record" the offer of proof that was made.

4. Petitioners, and especially the State of Texas, evince some feeling of outrage at being required to use this method of bringing the problem before the Commission and this court. We are not at all outraged. The making of an offer of proof is a very old procedure in the courts. It is expressly provided for in the Federal Rules of Civil Procedure, Rule 43 (c). We see nothing improper in the Commission's adoption of a similar and very useful procedure.

siding officer rejecting or excluding proffered oral testimony shall consist of a statement of the substance of the evidence which counsel contends would be adduced by such testimony; and if the excluded evidence consists of evidence in documentary or written form or of reference to documents or records, a copy of such evidence shall be marked for identification and shall constitute the offer of proof." (18 CFR § 1.28(b)).

We presume that the petitioners were familiar with the rules.

■ On brief in this court, Texas now says that it would have made a showing as to cost. The time and place to say that were in the offer of proof, and before the Examiner. Unless an offer of proof is complete enough to show that it was error to reject the proof, the offer is insufficient. See Kanatser v. Chrysler Corp., 10 Cir., 1952, 199 F.2d 610; Cavanaugh v. Fireman's Fund Ins. Co., 8 Cir., 1952, 197 F.2d 853; Dauksewicz v. United States, 1 Cir., 1951, 194 F.2d 52. Both the Examiner and the Commission could well conclude that petitioners were not in fact in a position to prove what they said, at other places in the record, that they could prove. Their actual offer did not support their assertions.

Moreover, as the Commission correctly points out, the proposed alternative, if adopted, would not be available for some time, but P.G. & E. needed the additional supply in 1966 and 1967. No doubt, unless there is a drastic change in the economy of California, P.G. & E. will need and seek additional supplies of natural gas, and so will the Southern California companies. We are told by the Commission that an application is now on file whereby P.G.T. seeks authority to sell P.G. & E. an additional 200,000 Mcf and that this application shows that P.G. & E. also expects to purchase an additional firm supply of 100,000 Mcf from El Paso. (Pacific Gas Transmission Co., FPC Docket Nos. CP 67–187, CP 67–188, filed Dec. 23, 1966). Thus "alternatives" are more likely, in the long run, to be ad-

ditional sources of needed gas, rather than true alternatives. We note, too, that the petitioners' contentions appear to be somewhat at variance with the policies that lie behind the decision of the Supreme Court in United States v. El Paso Natural Gas Co., 1964, 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12. We find no abuse of discretion by the Commission.

■ Texas, supported by TIPRO and amicus curiae, urges that the Canadian supply upon which P.G.T. will depend is inadequate and unreliable. There is evidence that the physical supply is more than adequate. The main thrust of the argument is that Canada could cut off the supply, and that in such a case neither P.G.T. nor P.G. & E. nor the Northern California consumers nor the Commission would have any recourse. As to this, the Commission said:

"The suggestion is made that the Canadian supplies may be cut off and are therefore unreliable. We think that the close relationship between the United States and Canada renders it unlikely that this sort of difficulty will arise. Also, this is an argument more properly advanced at the time of an application to construct new pipeline facilities. That a supply may be cut off in the future is not an argument against using existing facilities to bring out gas up to the time any cutoff occurs, although it may be an argument against investing in new facilities."

We agree.

■ The same parties point out that much of the Canadian gas has been purchased under contracts containing price escalation provisions (some 46% of the gas to be supplied under the present order), which would not be approved if the contracts were with domestic producers, and that the Commission has no effective way to control these prices. The Commission recognized this problem, but disposed of it as follows:

"There has been a decline in the percentage of reserves covered by the escalation clauses in question, and it ap-

pears this decline will continue. A majority of the additional gas that is the subject of the present applications will be furnished under contracts which do not · contain these escalation clauses, and this will have a retarding effect upon any potential price escalations. To require renegotiation of the producers' contracts, which we cannot directly control, might result in delay in obtaining the desired supplies of gas. There will be an immediate saving to American consumers when this gas is made available, and the potential price increase is some time in the future, if it occurs at all. We agree that it would be preferable if this type of escalation clause were not included in producer contracts, and its presence in contracts for new supplies would clearly be a factor in our consideration of any application for certification of pipeline facilities."

Again, we agree.[5]

We note that the possible adverse effect upon California consumers of increases in the Canadian producers' prices is substantially mitigated by the fact that only 30% of P.G. & E.'s gas comes from Canadian sources. It is also true that the more complete utilization of the present facilities, made possible by the order, will reduce the unit cost of all gas delivered

by P.G.T. to P.G. & E. by 3½¢ per Mcf, as well as reduce the cost to El Paso of gas delivered to it for the Northwest.

Texas, supported by amicus curiae, also asserts that the Commission did not take into account the adverse effect of importing Canadian gas upon domestic producers.[6] The record simply does not support the assertion. The proposition is stated most baldly by amicus, which says that it has decided that natural gas imports should not grow by more than 60,000 Mcf per year, and that the Commission erred in not adopting this policy. But it is to the Commission that the Congress has given authority; we are not advised by amicus as to what act of Congress has shifted that authority to amicus.

■ Finally, amicus says that P.G. & E. could use residual fuel oil to fire its boilers, instead of gas, and that the Commission should have denied the application on that ground. No doubt the Commission could consider this alternate fuel supply. But that hardly means that we can say that the Commission abused its discretion because it did not adopt it. Must the Commission deny authority to build a hydroelectric plant because consumers could light their homes with kerosene, or deny authority to import gas because home owners could heat their

5. In its 1960 order, the Commission also considered this problem:
   "Beyond these limiting factors, there remains the primary responsibility of the Canadian authorities to regulate producer and pipeline rates in such a way as to insure that the mutual benefits of the project as a whole will continue. A careful review of the Canadian legislation, including the National Energy Board Act, the Alberta Pipe Line Act, and the Alberta Gas Utilities Act, and the determinations made thereunder with regard to this project, demonstrates that the Canadian regulatory authorities now have a comprehensive rate and certificate jurisdiction at least equal to our own, and broad enough, in letter and spirit, to give effect to the principles of international comity and mutual responsibility on which the continuing success of this project ultimately depends. This legislation embodies

the same 'just and reasonable' standards as are found in the Natural Gas Act and guarantees that the American and Canadian consumer will be treated alike."

6. In this case Texas emphasizes the importance of exploration and exploitation of its natural gas resources. We note that in CIA Mexicana De Gas, S.A. v. FPC, supra, it attacked an order permitting the export of Texas gas to Mexico on the ground that it wanted to conserve Texas gas. (See 167 F.2d 805.) We are aware of Emerson's remark that a foolish consistency is the hobgoblin of little minds, adored by little statesmen and philosophers and divines. Still, we wonder, might not the importation of Canadian gas accomplish, to some extent, the same result? Cf. Harper Oil Company v. FPC, 10 Cir., 1960, 284 F. 2d 137, 139.

homes with Franklin stoves? We doubt that it has such authority. If it has, no reason for exercising it, other than bald assertion, is advanced here.

The petitions for review are denied.