### KENTUCKY UTILITIES COMPANY, Petitioner,

### v.

### The UNITED STATES FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

**Barbourville, Bardstown, Benham, Corbin, Falmouth, Madisonville, and Providence, Kentucky; the Electric & Water Plant Board of Frankfort, Kentucky; and Berea College in Berea, Kentucky, Intervenors.**

### No. 84-3014.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 6, 1984.

Decided June 28, 1985.

Rehearing and Rehearing En Banc Denied Sept. 10, 1985.*

---

* Judge Kennedy dissents for the reasons stated in the opinion.

Kennedy, Circuit Judge, dissented with opinion.

Malcolm Y. Marshall (argued), Garrison R. Cox, Ogden, Robertson & Marshall, Louisville, Ky., for petitioner.

Joseph Feit, Office of the Gen. Counsel, F.E.R.C., Joseph S. Davies, Mike Small (argued), Washington, D.C., for respondent.

James N. Horwood, Thomas C. Trauger, Patricia E. Stack, Spiegel & McDiarmid, Washington, D.C., for intervenors.

Before KENNEDY, KRUPANSKY and MILBURN, Circuit Judges.

KRUPANSKY, Circuit Judge.

The Kentucky Utilities Company has petitioned this court to review two orders issued by the respondent Federal Energy Regulatory Commission (F.E.R.C./Commission.) Specifically, the utility has requested review of the cancellation notice provisions which the F.E.R.C. has mandated for the Kentucky Utilities Company contracts with the intervening parties.

The intervenors, the Kentucky municipalities of Barbourville, Bardstown, Benham, Corbin, Falmouth, Madisonville and Providence, the Electric & Water Plant Board of Frankfort, and Berea College (Berea, Ky.), each purchase electricity from the Kentucky Utilities Company and distribute it to their residents. None of the intervenors are currently capable of generating their own electricity and they now, as always,

purchase their total electricity requirements from the Kentucky Utilities Co.

In 1978, the contracts between Kentucky Utilities and the municipal intervenors, although entered into individually, incorporated a cancellation provision requiring a three-year notice. In May 1978, Kentucky Utilities notified the intervenors of its intent to cancel their contracts effective May 31, 1981. Concurrently the utility company filed with the F.E.R.C. a proposed wholesale power contract to govern the supply of power to the intervenors. As relevant to this appeal, the proposed contract increased the cancellation notice period to five years. The intervenors objected and an administrative hearing was conducted.

An administrative law judge concluded that Kentucky Utilities had proved the need for a five-year cancellation notice. However, the a.l.j. limited application of the five-year provision to the two largest municipal intervenors. As to the remaining municipalities, the a.l.j. ordered a cancellation clause requiring only a three-year notice. Pursuant to the a.l.j.'s "compromise" solution, should municipalities with aggregate requirements of 25MW tender three-year notices of cancellation within any consecutive two-year period the remaining municipalities would be precluded from cancelling their contracts except on a five-year notice to Kentucky Utilities.

Kentucky Utilities excepted to other aspects of the a.l.j.'s decision but agreed "to live with" the three-year/25 MW limit provision for the small municipalities. The Commission, upon review, determined that the distinctions incorporated in the a.l.j.'s solution were unduly discriminatory and removed the preclusive effect of the 25 MW limit and permitted the larger municipalities to cancel "up to" 25 MW of demand on three years notice. Kentucky Utilities filed a petition for rehearing following which the Commission reinstated the aggregate limit of 25 MW cancellation on three years notice within any consecutive two-year period. The Commission declined to rescind the authority of the two large municipal systems to cancel "up to" 25 MW of demand on a three-year notice.

There followed this appeal.

Judicial review of an order of the Federal Energy Regulatory Commission (F.E.R.C./Commission) is limited in scope. *Ohio Power Co. v. F.E.R.C.*, 668 F.2d 880, 886 (6th Cir.1982) (quoting *Ashland Oil Co. v. Federal Power Comm'n*, 421 F.2d 17, 22–23 (6th Cir.1970)). The Federal Power Act, creating the F.E.R.C., specifically provides that the Commission's findings of fact "shall be conclusive" "if supported by substantial evidence". 16 U.S.C. § 825*l*(b).

The Act further strictly limits the issues cognizable upon judicial review to those issues explicitly joined before the F.E.R.C. during the course of the administrative proceedings: *"No* objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application *for rehearing* unless there is reasonable ground for failure to do so." 16 U.S.C. § 825*l*(b) (emphasis added). Judicial review of any issue not particularized in objections submitted to the agency is simply not available.[1] This is not an unfamiliar doctrine; it was explicated in clear

---

**1.** While the statutory language quite clearly requires, as a jurisdictional prerequisite to an appeal, that objections be specifically identified in a party's petition for rehearing, some courts have applied a more liberal approach. Namely, if an issue was raised prior to the filing of the petition for rehearing it was considered properly the subject of judicial review. *See, e.g., Villages of Chatham and Riverside, Ill. v. F.E.R.C.,* 662 F.2d 23, 30 (D.C.Cir.1981) (issues may be raised *"as late as"* the rehearing petition). *See generally Ohio Power Co. v. F.E.R.C.,* 668 F.2d 880, 888 (6th Cir.1982) ("no doubt" that issue

"was before the Commission [when] it was raised in the opinion of the a.l.j.").

In any event, an entire prohibition on judicial consideration of *any point* not clearly and completely enunciated in the petition for rehearing seems, for obvious reasons, a preferable rule. Such a rule is suggested by the statute and the case law. *See, e.g., F.P.C. v. Colorado Interstate Gas Co.,* 348 U.S. at 498, 75 S.Ct. at 471; *Panhandle Eastern Pipe Line Co. v. F.P.C.,* 324 U.S. 635, 649, 65 S.Ct. 821, 828, 89 L.Ed. 1241 (1945); *Cincinnati Gas & Electric Co. v. F.E.R.C.,* 724 F.2d 550, 553 (6th Cir.1984) *(dicta ).*

terms by the Supreme Court in *Federal Power Comm'n v. Colorado Interstate Gas Co.*, 348 U.S. 492, 500–501, 75 S.Ct. 467, 472, 99 L.Ed. 583 (1955) (quoting *United States v. L.A. Tucker Truck Lines*, 344 U.S. 33, 36–37, 73 S.Ct. 67, 68–69, 97 L.Ed. 54 (1952)):

> "We have recognized in more than a few decisions, and Congress has recognized in more than a few statutes, that orderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has the opportunity for correction in order to raise issues reviewable by the courts."

The necessity for prior administrative consideration of an issue is apparent where, as here, its decision calls for the application of technical knowledge, and experience not usually possessed by judges. The Federal Power Commission is an administrative agency the decisions of which involve those difficult problems of policy, accounting, economics and special knowledge that go into public utility ratemaking. For reviewing a rate made by the Federal Power Commission, the Court of Appeals has no inherent suitability comparable to that which it has for reviewing the judicial decisions made by a United States District Court.

(Citations omitted). *See also In re Permian Basin Area Rate Cases*, 390 U.S. 747, 766, 88 S.Ct. 1344, 1359, 20 L.Ed.2d 312 (1968) (court's review "authority is essentially narrow and circumscribed"); *Villages of Chatham and Riverton, Illinois v. F.E.R.C.*, 662 F.2d 23, 30 (D.C.Cir.1981); *Rhode Island Consumers' Council v. F.P.C.*, 504 F.2d 203, 212 (D.C.Cir.1974).

Judicial review has accorded great deference "to the informed judgment of the Commission", *In re Permian Basin Area Rate Cases*, 390 U.S. at 767, 88 S.Ct. at 1360, "as a specialized agency created by the Congress to deal with complex problems". *Ohio Power v. F.E.R.C.*, 668 F.2d at 886 (quoting *Ashland Oil, supra;* citing *California Gas Producers Ass'n v. F.P.C.*, 383 F.2d 645 (9th Cir.1967)).

■ "Deference" is not, however, tantamount to mechanical acceptance by the reviewing forum. In this circuit the F.E.R.C. order must survive what amounts to a three pronged attack:

> As to matters other than the issue of whether there is substantial evidence to support the Commission's findings, this court reviews to determine whether a rational basis exists for a conclusion; or whether there has been an abuse of discretion; or to determine whether the Commission's order is arbitrary; or capricious or not in accordance with the purpose of the Act.

*Ashland Oil v. F.P.C., supra, quoted in Ohio Power v. F.E.R.C., supra* (citations omitted). This, too, is a familiar standard, summarized by the Supreme Court in *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974), *reh'g denied*, 420 U.S. 956, 95 S.Ct. 1340, 43 L.Ed.2d 433 (1975):

> Under the "arbitrary and capricious" standard the scope of review is a narrow one. A reviewing court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." The agency must articulate a "rational connection between the facts found and the choice made." While we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned.

(Citations omitted). *See also Film Transit, Inc. v. I.C.C.*, 699 F.2d 298, 300 (6th Cir.1983).

Where the disputed issue particularly calls into play the special adeptness of the administrative body, there arises "a presumption of validity" which attaches to the

administrative decision. *In re Permian ... Cases*, 390 U.S. at 767, 88 S.Ct. at 1360. The challenger must undertake "the heavy burden of making a convincing showing that it is invalid because it is unjust as unreasonable in its consequences". *F.P.C. v. Hope Natural Gas Co.*, 320 U.S. 591, 602, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944) *quoted in In re Permian ... Cases, supra*. In prescribing "just and reasonable" terms, the F.E.R.C. may apply its expertise to reconcile "diverse and conflicting interests", *In re Permian ... Cases*, 390 U.S. at 767, 88 S.Ct. at 1360, and "to make the pragmatic adjustments which may be called for by the particular circumstances". *F.P.C. v. National Gas Pipeline Co.*, 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037 (1942), *quoted in Ohio Power v. F.E. R.C.*, 668 F.2d at 886.

The standards under which the F.E.R.C. reviews the contract here at issue are described in § 205 of the Federal Power Act. Codified at 16 U.S.C. § 824d, that enactment provides in relevant portion as follows:

> (a) All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges *shall be just and reasonable*, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.
>
> (b) No public utility shall, with respect to any transmission or sale ..., (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

(Emphasis added).

The petition for review implicates two F.E.R.C. opinions. The first was issued on May 31, 1983 (No. 169), 23 F.E.R.C. ¶ 61,-317 (1983); the second, issued upon the Kentucky Utilities Company petition for rehearing, was released on November 8, 1983 (No. 169–A): 25 F.E.R.C. ¶ 61,205 (1983).

In the initial opinion, the Commission emphasized that an essential purpose of a cancellation notice was to assist the utility to plan and program its future generating and distribution capability. 23 F.E.R.C. ¶ 61,317, at 61,668. Public utilities are mandated by law to plan and provide for future power requirements of their customers. Due to the exigencies of the industry, the "lead time" for the development of new power sources is extensive. *Id.*[2] As a result of the vital need for accurate growth predictions, utilities, the F.E.R.C. said, must have notice of decreases in customer requirements sufficiently in advance of the change in demand in order to incorporate it into its planning. *Id.* The Commission has noted that:

> What constitutes adequate notice varies, of course, with the circumstances. But, at least as a starting point, an acceptable measure for an adequate notice

---

**2.** Generally, the Commission observed, planning and providing for new generating capacity involves two distinct phases. In the first phase substantial capital expenditures are committed for investigating options, securing permits, and implementing actual construction of the new power source. 23 F.E.R.C. ¶ 61,317 at 61,668. During this preliminary phase the utility enjoys considerable flexibility to adjust to modifications in its forecast of future requirements. *Id.* at 61,699, n. 22.

At some point in time, however, the utility must commit to the construction of a particular generating facility. *Id.* at 61,669. At that time it must actually commit the enormous capital investment to the project with virtual finality. In this environment, and with a large amount of the investment of capital at stake, the reliable projection of future requirements becomes essential. As explained by the Commission,

> In making their plans as to what type and size generating units to build, where to build them, and most importantly, when to build them, utilities must rely on projections of load growth and future requirements. These projections have to be as accurate as possible. The consequences of error are too great for them not to be.

23 F.E.R.C. ¶ 61,317, at 61,668 (footnotes omitted).

period is certainly that it should roughly approximate the period between the time the utility makes major commitments of capital to building generating units to serve its customers' future requirements and the time the generating unit is completed.

*Id.* (footnote omitted). The F.E.R.C. determined in this case that the evidence had demonstrated the relevant period to be *"at least* five years". *Id.* at 61,669. "Accordingly, we ... find that Kentucky [Utilities] has provided substantial support for the reasonableness of the five year notice period." *Id.* The municipal intervenors have disputed neither of these findings. *Id.*

The intervening cities, however, argued to the Commission that Kentucky Utilities could absorb a loss of their relatively limited quantity purchases in a short period as a result of increased demand for power by its other customers. *Id.* The Commission was not persuaded:

> [T]his misses the point. The Cities' needs for electricity are growing. Kentucky [Utilities] includes the Cities' growing needs in formulating its plans.... Hence, if one of the Cities switches to another supplier, Kentucky [Utilities] will lose the customer's anticipated growth. That loss in growth imposes economic disadvantages on the company in the form of lost revenues and the incurrence of unneeded fixed charges ... these economic disadvantages *will be permanent.* Hence we do not believe that simply because each of the Cities is small, the need for a long notice period is eliminated.

*Id.* (footnotes omitted; emphasis added). Even in view of potentially off-setting savings (such as operating at a reduced load factor, increased flexibility and reliability, use of the excess capacity to reduce power purchased from other systems or to increase power sold to other systems), the F.E.R.C. concluded that "the possible loss to Kentucky [Utilities] would be significant". *Id.* at 61,687 n. 20. The Commission thus determined that Kentucky Utilities would be unable to "absorb" the loss of even one of the municipal intervenors without "permanent" and "significant" economic disadvantages.

The intervening municipalities suggested a number of procedures whereby Kentucky Utilities might adjust its future plans after commitment to specific generating units, to counter the loss of a municipal wholesale customer. The F.E.R.C. rejected each of the intervenors' suggestions and no appeal therefrom was pursued. Nevertheless, the Commission concluded that Kentucky Utilities had the capability of "adjusting" to reductions in demand in less than five years. The Commission identified two reasons for its conclusion: (1) the testimony of the president of Kentucky Utilities, and (2) "even without this testimony", the record evidence that Kentucky Utilities could adjust its "sale and purchase of what we call coordination services". 23 F.E.R.C. ¶ 61,-317, at 61,671. The testimony relied upon by the Commission was:

> Q. [D]o you intend an impression that [Kentucky Utilities] would have no concern or problem if [Kentucky Utilities] should lose, at one time, less than the total of its Municipal load?
>
> A. Decidedly not.
>
> While the precise figures vary from year to year, Frankfort alone comprises about 40% or better of KU's total municipal load. Madisonville, alone, is approximately another 20% of the total. KU would need the requested five years time to adjust its plans and operations if either of these loads singly, or certainly their loss combined, or the loss of any combination of even the smaller Municipals together comprising an appreciable part of the total.
>
> While KU might single out several of the smallest of the Municipals and provide for less than five-years cancellation notice in their particular contracts, while maintaining the five-year term in the contracts of Frankfort, Madisonville *and* some of the other larger cities, that approach did not appear to us to be feasible. In addition to questions of discrimination, the ap-

proach would fail to take into account the possibility that, as demonstrated by Municipals' own plans, combinations of the Municipals might leave at one time.

In our judgment, the five-year term applicable alike to all of the Municipals is the only provision equitable from the standpoint of KU and all of the Municipals.

*Joint Appendix* 103 (emphasis supplied). Kentucky Utilities urges on appeal that the foregoing testimony fails to support the Commission's decision. This contention is of questionable relevance since the Commission itself has repudiated the importance of this testimony to its decision. 23 F.E.R.C. at 61,671.

According to the Commission, the ability of Kentucky Utilities to adjust its sales and purchases of "coordination services" enables the company to reduce the financial disadvantages of a loss of demand in a period of less than five years:

The other type of transactions involve the sale and purchase of what we call coordination services. These include short-term power, emergency power, maintenance power, economy energy, and the like. Whether these transactions occur depends largely on whether the buying utility has a temporary need for additional or more economic generating capacity. Hence, Kentucky argues, it is entirely speculative whether these transactions will reduce excess capacity.

\* \* \* \* \* \*

But we think Kentucky's sales and purchases of coordination services gives it sufficient ability to reduce its loss that some modification of the five year notice period is justified. To be sure, we agree it is not certain that these transactions will occur to an extent needed to absorb all of the excess capacity that might result if *one* of the Cities were to leave. We also agree that Kentucky might not be fully compensated even if the transactions occur.

But Kentucky both buys and sells coordination services. It does so consist-

ently. And it does so on a significant scale. Hence it is a realistic possibility that Kentucky could use any excess capacity the departure of one [of] the Cities might cause to reduce its purchases of coordination serve to cover a temporary generating deficiency on its system. Moreover, because Kentucky's ability to sell coordination services to other utilities depends on its having excess capacity, the departure of one of the Cities increases the company's opportunities to engage in such transactions.... In either event Kentucky could reduce the financial loss caused by the departure of one of the Cities. We cannot ignore these possibilities.

*Id.* at 61,671–61,672 (emphasis supplied; footnotes omitted). To support its conclusion that sales of emergency power to other utilities could accommodate absorption or the loss of a municipal customer, the Commission cited the testimony of Arthur Simon, an expert who testified on behalf of the municipal intervenors. The relevant Simon testimony was:

That KU followed this normal utility practice can be shown for the years 1974 through 1977 \* \* \* KU's purchases from Public Service Company of Indiana ("PSI") are indicative of the trend.... KU's purchase of short-term power from PSI were as follows: 1974–442,823 Mwh, 1975–510,615, MWH, 1976–904,610 MWH, 1977–9,217 Mwh. Short term power purchases from other utilities ... followed a similar pattern....

Therefore, during those years 1974 through 1977, when [the utility] was so concerned about KU's idled capacity which would be created if Frankfort purchases 5 MW of power from [another supplier], KU was purchasing large amounts of short-term power. By reducing those purchases a de minimus amount, KU would have eliminated any effect of a loss of 5 MW of load.

*J.App'x* 158. The rebuttal testimony of the president of Kentucky Utilities characterized the Simon testimony as "a meaningless discussion" because such "coordination

sales" (or "opportunity transactions" as petitioner calls them) are by definition of an emergency nature and not capable of being factored into a delicate planning process. *J.App'x* 159–60. The gist of the testimony was that while the demands of the municipality were planned, provided, and paid for by the utility, the potentiality of coordination sales could not be, in sum, an unreliable unknown factor. As a result, excess generating capacity would be unavoidable, while emergency sales would be speculative. Further, because sales of coordination power would be at relatively low rates, the utility could never fully recoup its losses, even if it sold its entire excess capacity. *J.App'x* 150–60. As noted, the Commission conceded the accuracy of the observations of the utility's president, but was unpersuaded. Even with the conceded difficulties, the Commission reached the conclusion that the utility "could reduce the financial loss occasioned by the departure of one of the Cities". 23 F.E.R.C. at 61,672.

The Commission next removed the prohibition on further · cancellations once Kentucky Utilities received in a single two-year period notices of terminations aggregating 25 MW. The F.E.R.C. also permitted *any* municipality to cancel a portion of its contracted requirements, up to 25 MW, upon three years notification. Effectively, the five-year provision imposed on the two largest cities was eradicated:

> The Cities argue that each customer should be allowed to give notice of cancellation for a part of its load. We agree. We do so because the distinction between a complete and a partial termination is of no practical significance. The loss of a 10 MW load has the same impact on Kentucky [Utilities] whether it comprises all, or only a part, of the customer's requirements. Failure to reflect this fact in the notice provision ... would ... make that provision unduly discriminatory.

\*　　\*　　\*　　\*　　\*　　\*

Based on our holdings the term and notice provision we find reasonable is:

> *TERM:* The company agrees to provide, and the customer agrees to take, service pursuant to the applicable rate schedule until the agreement is cancelled by either party giving written notice five years in advance. However, for loads of 25 MW or less, whether for all or part of the customer's requirements, the agreement may be cancelled by either party giving written notice three years in advance.

*Id.* 1 at 61,673, 61,677 (footnote omitted).

The Kentucky Utilities Company then filed with the F.E.R.C. an application for rehearing. The sum and substance of this document is significant to this court's jurisdiction to review issues of, and entertain arguments relative to, the Commission's opinion. *See* n. 1 *supra.*

Regarding the cancellation period, Kentucky Utilities initially emphasized that the record evidence supported *only* a five-year notice provision. *J.App'x* 274. The petitioner repeated, however, the utilities' "offer" to settle for the a.l.j.'s original three-year/25 MW aggregate limit provision. *J.App'x* 281. In the petition for rehearing Kentucky Utilities requested either reinstatement of the 25 MW two-year aggregate limit, or application of its original request for an across-the-board five-year term. *J.App'x* 281, 286.

The petition for rehearing argued that the supply contract as formed *per* the F.E.R.C. decision was unjust and unreasonable because of the disparity of the division of obligations between the utility and municipalities. Under the contract provisions imposed by the decision, the cities would be required to forecast their needs, on a continuing basis, eight years in advance. *See* 23 F.E.R.C. at 61,684. Kentucky Utilities would then be obliged to *"plan and provide for* forecasted increases in the customer's requirements". *Id.* (emphasis supplied). This mandated an irrevocable commitment of capital to plan for the projected increase in demand, and, at least five years prior to materialization of the increased demand, payment of up to a billion dollars for the construction of a generating unit to

insure generating capacity to respond to the forecasted increases in demand of the intervenors and the utility's other customers.

In addition, Kentucky Utilities was foreclosed from refusing to supply any increase in demand to any customer. *Id.* To meet that increased customer demand, the F.E.R.C. contract would necessitate the company to purchase power from other sources if it could not satisfy the demands by its own generating capability.

While the utility would be obligated to satisfy the total demands of all of its customers on a continuous eight year forecast, eight of the ten municipalities could cancel its contract within three years thereby absolving them from any obligation to purchase any power from Kentucky Utilities even though the utility had expanded its generating capacity in reliance upon the cities' growth estimates. The two largest cities could cancel up to 25 MW *each* on three years notice. Moreover, although the company would be required to finance generating sources of sufficient capability to supply the cities' increased demands, the cities could opt to purchase any portion, or all, of their increased needs from another company without *any* notice to Kentucky Utilities. 23 F.E.R.C. at 61,666.

Kentucky Utilities initially represented to the Commission that only the five-year term would sufficiently protect the capital investment undertaken on behalf of the intervenors; this would allow sufficient advance warning to permit the Company to avoid, reduce, or delay commitments to a generating unit construction contract. In addition, the five year cancellation would ensure that the participating cities would purchase the power previously planned and allocated to satisfy their projected demands.

However, the petitioner conceded that it could absorb the excess capacity created by a three-year term for the smaller intervenors provided the 25 MW/two-year aggregate limit was reinstated. Kentucky Utilities also requested that the provision permitting a partial cancellation of purchases "up to 25 MW" on a three-year notice be eliminated.

The petitioner did not, however, abandon its claim for a five-year provision. The petition for rehearing repeatedly emphasized an across-the-board five-year notice term. *E.g., J.App'x* 281–85. In urging the F.E.R.C. to reconsider and grant the five year provision as to all intervenors, the utility addressed the two reasons articulated for the shorter term: (1) the utility's ability to lessen the impact of excess generating capacity through "coordination" or "opportunity" purchases, and (2) the "anticompetitive" effects of the five-year notice. *J.App'x* 281.

Regarding opportunity or coordination sales, the utility stressed that the excess generating capacity which would result from the loss of a single city could not be adequately absorbed. First, the petitioner noted that even the occurrence of such transactions was purely speculative; second, that any sales which were made would not begin to amortize the fixed *pro rata* construction costs of the new generating unit to provide the power to satisfy the projected increased demands; and third, the utility observed that, due to decreasing demand nationwide, other utilities would also have excess capacity. Therefore, the company argued, it would be increasingly unlikely that it could increase its sale of emergency power to make up for the loss of even one municipal customer.

As to the effect on the marketplace, Kentucky Utilities argued that by requiring it to plan and finance the generation of power for the municipalities over an eight-year period, but allowing the customers to cancel within three years, the municipality's share of the fixed costs would be shifted to the utility's remaining customers. Thus, the detriment to the marketplace of mandating the municipalities to remain an additional two years would be slight compared to the enormous cost-shifting which would result from a three-year cancellation notice.

In its opinion on rehearing, the Commission reinstated the 25MW/two-year limitation but declined any other relevant

change. 25 F.E.R.C. ¶ 61,205 at 61,544. There ensued this timely petition for review.

On judicial review, Kentucky Utilities asserted that the Commission's decision was "unlawful" because it did not "satisfy the statutory 'just and reasonable' standard", and because it "would be totally unworkable". *Brief on Behalf of Petitioner*, 3/29/84 (Kentucky Utilities Brief) at 9. Summarizing, Kentucky Utility argued on appeal that:

> 1. KU is entitled to the requested full five years notice of cancellation ...;
> 2. There would be no undue discrimination, in the Law Judge's provision for three years cancellation notice of the contracts of the small systems, and five years for those of the large;
> 3. However, if undue discrimination should be found in such provision of the Law Judge, on the record of this proceeding the only appropriate means of eliminating that discrimination would be a provision for the straight five years notice as to all Municipals ...; and
> 4. In its Opinions, the Commission has failed even to attempt to justify its failures to accept three significant findings and rulings of the Administrative Law Judge....

*Kentucky Utilities Brief* at 9–10. Thus, the utility continued its dichotomous claims by urging the five-year notice at the same time indicating a willingness to accept the a.l.j.'s recommendations. Comparatively, it is apparent that there is only one difference between the a.l.j.'s order and the Commission's resolution. The a.l.j. applied the five-year notice to a totality of the two largest municipalities' commitment, while the F.E.R.C. decisions permitted the two largest systems to cancel "up to" 25 MW of their projected demands on three years notice.

■ This partial service provision should be rejected, according to the petitioner, because it is "unworkable," *Kentucky Utilities Brief* at 41–42, and because it is "unconscionable[,] unjust, unreasonable and unlawful". *Kentucky Utilities Brief* at 44. The utility's argument that a partial cancellation was physically impossible to accomplish is without factual support in the record. Thus, this court is not authorized to conclude that the F.E.R.C. allowance of a partial cancellation was improper.

■ A more fundamental reason for rejecting this "unworkability" argument does obtain, however, on this record. In the Kentucky Utilities petition for rehearing, *J.App'x* 244–281, not once did the utility urge to the agency that partial termination was an engineering impossibility. *Id. passim*. It is decidedly too late in the game to introduce a new argument (and a new factual issue) in the court of appeals. The statute limits this court's jurisdiction to those points enunciated by the petition for rehearing; the ability of the municipal intervenors to receive partial service is not within the ambit of the statutory review authority of this court.[3]

Addressing the second prong of the attack on the partial cancellation provision, the petitioner at pages 44 and 45 of its initial brief, advanced its argument in the following context (emphasis in original):

> [I]t would be unconscionable—unjust, unreasonable and unlawful—to permit the Commission to—
>
> > *First*, hold that KU is justly entitled to five years cancellation notice, but
> >
> > *Second*, hold—on the basis that short-notice of a small Municipal would not be as severely damaging to KU as loss of a large one—that permitting the small Municipals to cancel on three

---

**3.** The municipalities are without the capacity to generate their own power and all transmission lines to their receiving plants are owned by Kentucky Utilities. The Commission notes that Kentucky Utilities, therefore, controls whether the intervenors could obtain part of their requirements from other utilities (*via* a "wheel-ing" arrangement). Thus, while there are current negotiations aimed at a wheeling agreement, it appears that the petitioner is the source of any engineering impossibility of a partial needs contract. *See generally Southeastern Power Administration v. Kentucky Utilities Co.*, 16 F.E.R.C. § 63,051, 65,248–65,252 (1981).

years notice would not be discriminatory, and then,

*Finally,* reverse itself of such discrimination holding, and *use* the "discrimination" *which it and the Judge had themselves created,* as a basis for creating even further inroad into the five years notice to which KU is justly entitled—to say nothing of the destructive nature of the "partial" termination concept.

The Commission's rationale for the partial termination clause was, as the petitioner observed, predicated on its view that otherwise undue discrimination would result:

The Cities argue that each customer should be allowed to give notice of cancellation for a part of its load. We agree. We do so because the distinction between a complete and a partial termination is of no practical significance. The loss of a 10 MW load has the same impact on Kentucky whether it comprises all, or only a part, of the customer's requirements. Failure to reflect this fact in the notice provision ... would, as the Cities correctly observe, make that provision unduly discriminatory.

23 F.E.R.C. at 61,673 (footnote omitted). Because there is no contrary evidence, deference to the expertise of the Commission dictates the acceptance of the premise that a 10 MW cancellation has the same effect on the utility whether it is received from a 10 MW customer or an 82 MW customer. Therefore, the Commission's partial termination clause seems to be a legitimate pragmatic adjustment called for by the particular circumstances of this case. *F.P.C. v. National Gas Pipeline Co.,* 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037 (1942). *See Ohio Power Co. v. F.P.C.,* 668 F.2d at 886.

While the F.E.R.C. presented rather simplistic logic, there is no evidence that "there has been a clear error of judgment" on this issue. *Bowman Transportation Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974), *reh'g denied,* 420 U.S. 956, 95 S.Ct. 1340, 43 L.Ed.2d 433

(1975). Nor does it appear that the partial cancellation proviso "is invalid because it is unjust and unreasonable in its consequences." *F.P.C. v. Hope Natural Gas Co.,* 320 U.S. 591, 602, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944). To the contrary, because the substantiated finding that partial cancellations are of equal effect as total terminations, it appears that the agency did articulate a "rational connection between the facts found and the choice made." *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962), and therefore the partial termination provision must be affirmed.

■ The remaining issue is the propriety of the agency's refusal to award Kentucky Utilities its initial request of an across-the-board five year notice provision. It is not disputed that there was substantial evidence to support a conclusion that such a cancellation provision would be just and reasonable. The utility argues on appeal that the *three* year notice is without evidentiary support and that the Commission's rationale for invoking it was defective.

As previously noted, the Commission initially relied upon the testimony of the petitioner's president as support for the shorter term. Kentucky Utilities correctly challenges the agency's use of that testimony (reprinted herein at pp. 10–11). When the utility executive conceded that they "might single out several of the smallest of the Municipals and provide for less that five-years cancellation notice", he was clearly referring to the three or four smallest users. The bottom three users *totalled* 7 MW, the bottom four consumed a *total* of 13 MW peak load. The remaining intervenors had *individual* peak loads of 12(2), 13(2), 15, 42 and 82. Considered in context, the testimony in question does not support the finding that 25 MW is a reasonable point below which three years notice would be sufficient. At best it would support a reduced provision only for the four smallest users. Also, the Commission elected not to rely on that testimony to support its decision; in opinion No. 169, the F.E.R.C. specifically notes that "even without this

testimony", the agency would reach the same result.

The Company next challenges the Commission's alternative premise that the utility would be capable of offsetting a 25 MW loss on three-years notice by adjustment of "opportunity" or "coordination" transactions. The F.E.R.C. engaged in questionable logic as to this issue. The Commission specifically found that the loss of even a single municipality would result in permanent and significant economic losses to the utility which, notwithstanding potential savings, the company would be incapable of absorbing. *See* 23 F.E.R.C. at 61,669–70, 61,687 n. 20. The F.E.R.C. also found that the evidence supported the utility's claim that "at least five years" constituted an "adequate" termination notice period. *Id.* at 61,668–61,669. Then, pulling the rabbit from the hat, the Commission concluded that Kentucky Utilities could "adjust" this "permanent" and "significant" damage in less than five years. *Id.* at 61,671.

The Commission predicated this conclusion on the possibility that Kentucky Utilities could adjust its "opportunity"—"coordination" sales and purchases. At the same time, the Commission conceded that such sales and purchases were merely speculative. The finding that Kentucky Utilities could "adjust", conflicts with the Commission's determination that, notwithstanding the company's use of such "excess capacity to reduce its purchased power expenses or to make sales to other utilities", "the possible loss to Kentucky would be significant", 61,687 n. 20, and the finding that under a termination notice period of less than five years, the company's "ability to adjust for changes in loads is limited." 23 F.E.R.C. at 61,671.

The Commission did not cite to the record evidence linking the three-year term to the utility's ability to rearrange its financial commitments. The only relevant evidence firmly established, as the Commission explicitly found, that at least a five year period was necessary. The Commission relied on admittedly speculative "emergency" transactions as justification. No rational basis exists, in the record or the agency's own findings, for the Commission's arbitrary selection of a three-year term.

Finally, the imposition of the three-year cancellation provision violates the statutory measure calling for "just and reasonable" terms. The Commission would require the utility to plan for and commit huge sums of money for its customers' future power requirements, but would permit the municipalities who secured the benefit of that fixed obligation to transfer the burden of the undertaking to the utility and its other customers. This is neither a just nor reasonable rule, as the Commission itself has previously observed, *see Arizona Public Service Co.,* 18 F.E.R.C. ¶ 61,197, 61,395—61,397 (1982):

> [W]here a utility provides long-term wholesale service, it incurs fixed costs and is required to make long range capacity plans. It would not be in the public interest to eliminate the notice requirement which is necessary to assure a smooth transition and prevent injury to the public.

*Id.* at 61,401 n. 6 (citing *Boston Edison Co.,* 56 F.P.C. 3414 (1976)). We concur in that sentiment.

Accordingly, the Commission's orders are vacated and the matter is remanded. The Commission is instructed to amend its orders in a manner consistent with this opinion.

KENNEDY, Circuit Judge, dissenting.

I am unable to agree that the Commission could not except a maximum of 25 MW from the five-year notice requirement and allow cancellations of up to that amount with three years notice. Although the Commission's decision leaves Kentucky Utilities vulnerable to possible losses deriving from a notice period shorter than the lead time needed to commit capital for new generating facilities, the Commission's terms are nonetheless reasonable if they represent a balance struck between the possibility of such losses and the benefit to competition derived from a shorter notice period.

The Commission found that Kentucky Utilities could suffer a significant loss if it did not have the five-year notice. It made no specific finding, however, as to the significance of that portion of the loss attributable to cancellation of 25 MW with three years notice instead of five. Kentucky Utilities states in its brief that the loss would be at least $10,500,000, using the municipals' witness' figures.[1] The Commission held that Kentucky Utilities could reduce this loss by either selling more or purchasing less coordination services. The Commission states that Kentucky Utilities bought and sold coordination services consistently and on a significant scale. It relies for this holding on the testimony of Arthur Simon, a witness for the municipals. Simon's testimony relates only to purchases. He testified that by reducing those purchases a de minimis amount, Kentucky Utilities could eliminate the effect of a loss of 5 MW of load. The Commission concluded that there was a significant possibility that Kentucky Utilities could *reduce* the financial loss caused by the departure of one of the municipals by adjusting its purchases of coordination services.

The Commission then went on to hold that a sliding scale notice provision would be an ideal balancing of all the relevant factors, but that the record evidence would not permit it to devise a scale and that even if it had the evidence a sliding scale would be too complicated. Thus, a notice period which roughly reflected Kentucky Utilities' ability to adjust to the loss of a customer was acceptable. The Commission adopted the 25 MW figure because the municipals' witness had suggested that there should be a longer notice period for loads larger than 25 MW. The Commission went on to hold that there was no evidence that the present three-year notice provision was unreasonable (presumably referring to loads under 25 MW).

If the possible loss to Kentucky Utilities were the only factor in the Commission's analysis, I would be inclined to agree with the majority. However, the Commission throughout its opinion also considered the rights of the municipals to purchase from Kentucky Utilities' competitors, or possible competitors, to be an important factor.[2] Although the Commission does not state how competition will benefit from a shorter notice period for up to 25 MW, it must be conceded that there will be some benefit. The Commission has previously recognized that long notice provisions are anti-competitive: "There is little question that the termination clauses restrict customer ability to obtain alternative sources of power. However, the courts have held that an anti-competitive provision may be just and reasonable if it serves a legitimate purpose." *Arizona Public Service Co.*, 18 F.E.R.C. ¶ 61,197 at p. 61,396 (1982). The question, therefore, is not whether Kentucky Utilities is insulated from losses that might result from the shorter notice period, but rather is whether the possibility of such losses has been reasonably balanced against the benefits to competition that may be achieved.

The Commission's balancing of these factors is subject to a strict standard of review:

First, [the reviewing court] must determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. Second, the court must examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Third, the court must determine whether the order may reasonably be

---

**1.** It argues that the loss would in fact be much greater since the figures used by the municipals witness are outdated and the loss would actually be more than twice as much. However, the only figures in the record are those of the municipals' witness.

**2.** The effect on competition was carefully considered in section III D of the opinion, 18 F.E.R.C. at pp. 61,673 to 61,676, where the Commission evaluated the municipals' argument that the ordered notice periods were too long.

expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, *and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors.* *Permian Basin Area Rate Cases,* 390 U.S. 747, 791–92, 88 S.Ct. 1344, 1372–73, 20 L.Ed.2d 312 (1968) (emphasis added). I believe that the Commission gave reasoned consideration to the possibility that Kentucky Utilities might not be fully compensated for losses incurred as a result of the shorter notice period, weighed that possibility against the benefit to competition, and concluded that a shorter notice period for up to 25 MW loads would be just and reasonable.

Accordingly, I would affirm the Commission.