397 F.2d 753
 ATLANTIC SEABOARD CORPORATION, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent.
Commonwealth Natural Gas Corporation, Transcontinental Gas Pipe Line Corporation, Washington Gas Light Company, and Public Service Commission of the District of Columbia, Intervenors.
 No. 11404.
 United States Court of Appeals Fourth Circuit.
 Argued February 7, 1968.
 Decided June 12, 1968.
 
 Richard A. Rosan and Giles D. H. Snyder, New York City (C. E. Goodwin, L. Sargeant, III, Charleston, W. Va., W. C. Hart, Washington, D. C., John W. Barnum, New York City, and David S. Cupps, New York City, on brief), for petitioner.
 Peter H. Schiff, Solicitor, F. P. C. (Richard A. Solomon, Gen. Counsel, James N. Horwood, Russell B. Mamone and Joseph J. Klovekorn, Attys., F. P. C., on brief), for respondent.
 Thomas F. Ryan, Jr., Richard J. Connor, and Gallagher, Connor & Boland, Lawrence H. Gall, Washington, D. C., and William N. Bonner, Jr., Houston, Tex., on brief, for intervenor Transcontinental Gas Pipe Line Corp.
 James O. Watts, Jr., Lynchburg, Va., on brief, for intervenor Commonwealth Natural Gas Corp.
 C. Oscar Berry, Karl Michelet, Reuben Goldberg and George F. Donnella, Washington, D. C., on joint brief for intervenors Washington Gas Light Co. and Public Service Commission of the District of Columbia.
 Before HAYNESWORTH, Chief Judge, and CRAVEN and BUTZNER, Circuit Judges.
 BUTZNER, Circuit Judge:
 
 
 1
 Atlantic Seaboard Corporation seeks to set aside an order of the Federal Power Commission that allowed a new supplier of gas in markets it alone had served. The commission authorized Transcontinental Gas Pipe Line Corporation (Transco) to furnish part of the requirements of Washington Gas Light Company and Commonwealth Natural Gas Corporation. It denied authorization for these requirements to Seaboard. We deny Seaboard's petition and affirm the order of the commission.[1]
 
 
 2
 Washington is a gas distributor primarily serving retail customers in the District of Columbia and neighboring counties in Maryland and Virginia, and through its subsidiary, Shenandoah Gas Company, customers in one Virginia and two West Virginia counties. Commonwealth, a natural gas pipeline company, sells to local distributors serving Richmond and Tidewater, Virginia. It is primarily a wholesaler, but also supplies a large industrial customer at Hopewell, Virginia. Washington and Commonwealth formerly purchased all their requirements from Seaboard.
 
 
 3
 Seaboard is one of 18 companies of the Columbia Gas System, the largest integrated natural gas system in the United States. Seaboard's pipeline serves distributors in West Virginia, Virginia and Maryland. It purchases most of its gas from United Fuel Gas Company, also a Columbia subsidiary. United Fuel obtains its gas from another subsidiary, Columbia Gulf Transmission Company, which transports gas from fields in Louisiana.
 
 
 4
 Transco operates a pipeline from Texas and Louisiana to New York City. Its line passes through areas served by Commonwealth and Washington.
 
 
 5
 In 1964 Washington and Commonwealth contracted with Transco for the purchase of part of their gas, and Transco sought authority from the commission to furnish these requirements. Seaboard opposed Transco's application and sought to supply the increased needs of Washington and Commonwealth. The hearing examiner denied Transco's application and granted Seaboard's. The commission adopted most of the examiner's material findings of fact, but reversing his decision, concluded the public interest would best be served by granting Transco's application.
 
 
 6
 Our role is limited. Section 19 (b) [15 U.S.C. § 717r(b)] of the Natural Gas Act provides, "The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." Moreover, "* * * Congress has entrusted the regulation of the natural gas industry to the informed judgment of the Commission, and not to the preferences of reviewing courts. A presumption of validity therefore attaches to each exercise of the Commission's expertise, and those who would overturn the Commission's judgment undertake `the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences.'" Permian Basin Area Rate Cases, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); California Gas Producers Ass'n v. FPC, 383 F.2d 645, 648 (9th Cir. 1967). In determining whether the commission's order is supported by substantial evidence in the record as a whole and whether it represents a reasonable balancing of relevant considerations determining the public interest, our review may be divided conveniently into three parts: First, the advantages that accrue to Washington, Commonwealth and the public they serve by receipt of part of their requirements from Transco; second, the detriment the pipelines and the public they serve will suffer from the certification of Transco; and third, deficiencies Seaboard attributes to the commission's procedures.
 
 I.
 
 7
 Transco and Seaboard require their customers, including Washington and Commonwealth, to buy gas under a two-part rate consisting of a demand charge and a commodity charge. The demand charge is based on the maximum daily volume the seller is obliged to deliver. It does not vary with the volume actually delivered. The purchaser must pay the demand charge whether or not it takes the gas. The commodity charge is based solely on the volume delivered. During the proceedings both Seaboard and Transco modified their tariffs. Their present demand charges are approximately the same, but Transco's commodity charge is about 5 cents per Mcf less than Seaboard's.[2]
 
 
 8
 Most of Washington's customers purchase gas for heat. Demand for its gas is heavy during the winter, and the maximum daily demand may occur only on a few days during the heating season. Nevertheless, Washington must purchase each month substantial quantities under Seaboard's demand charge to have gas available to meet its peak requirements. With relatively slight industrial activity in the District of Columbia metropolitan area, Washington has little opportunity to sell interruptible industrial gas during off-peak seasons. A feasible method of correcting this imbalance is by the purchase of winter storage service from pipelines.[3] In 1964 Washington proposed to buy from Transco up to 55,000 Mcf per day and storage service up to 49,000 Mcf per day. Commonwealth proposed to buy up to 27,700 Mcf per day and storage up to 2,000 Mcf per day. It was for this authorization that Transco applied.
 
 
 9
 The commission adopted the examiner's finding that Washington would save more than $800,000 for 1966-68 by certificating Transco. Savings of approximately $1,000,000 in the same period would accrue to Commonwealth. All Washington's savings and most of Commonwealth's would be passed on to their customers through rate reductions.
 
 
 10
 Although the public interest is not determined solely by savings from rate reductions, the commission properly gave this factor great weight. In Atlantic Refining Co. v. Public Service Comm. of State of New York, 360 U.S. 378, 388, 79 S.Ct. 1246, 1253, 3 L.Ed.2d 1312 (1959), the Court said:
 
 
 11
 "The purpose of the Natural Gas Act was to underwrite just and reasonable rates to the consumers of natural gas. * * * As the original § 7(c) provided, it was `the intention of Congress that natural gas shall be sold in interstate commerce for resale for ultimate public consumption for domestic, commercial, industrial, or any other use at the lowest possible reasonable rate consistent with the maintenance of adequate service in the public interest.' * * * The Act was so framed as to afford consumers a complete, permanent and effective bond of protection from excessive rates and charges."
 
 
 12
 The commission also determined that a second supplier would increase reliability of service to the public Washington and Commonwealth serve. Although Seaboard has emergency connections with Transco's line at two points, the commission found that Transco's obligation to have capacity available for Washington would result in greater assurance in the event of emergency. This is a proper factor to consider. See Home Gas Co. v. FPC, 97 U.S.App.D.C. 300, 231 F.2d 253, 256, cert. denied, 352 U.S. 831, 77 S.Ct. 45, 1 L.Ed.2d 51 (1956).
 
 
 13
 A third element is the benefit of Transco's competition upon the market. The effect is not conjecture. As a result of Transco's proposals, Seaboard reduced its rate and introduced a winter service that afforded pipeline storage. The commission properly weighed the introduction of competition in determining the public interest. Panhandle Eastern Pipe Line Co. v. FPC, 83 U.S.App.D.C. 297, 169 F. 2d 881, cert. denied, 335 U.S. 854, 69 S. Ct. 81, 94 L.Ed. 402 (1948).
 
 
 14
 Substantial evidence, most of it uncontradicted, supports the finding that Washington, Commonwealth and their customers will benefit by certification of Transco.
 
 II.
 
 15
 Seaboard's principal objection is to the commission's determination that the detriment to Seaboard and Columbia is insufficient to counter the benefits to Washington and Commonwealth and their customers. The examiner and the commission differed on this phase of the case. Admittedly Seaboard will suffer several ways. Approximately 80 per cent of the gas Transco will furnish Washington is for incremental or new requirements. About 70 per cent of Commonwealth's purchases will be incremental. The remainder will be diversions from Seaboard. The reduction in Seaboard's sales will not cause it to operate at a loss, but will curtail its rate of growth from about seven to two per cent if no offseting sales are taken into account. Further, Washington and Commonwealth propose to purchase from Transco at load factors exceeding load factors on their own systems.[4] This will reduce the load factor at which purchases are made from Seaboard, and will increase Seaboard's unit cost. However, neither Washington nor Commonwealth proposes any reduction in purchases from Seaboard under its demand charge rate. During peak periods Washington and Commonwealth require all their contract demand quantities from both Transco and Seaboard. On a monthly and annual basis, however, neither is able to take all its contract demand quantities from both suppliers. Therefore, in slack periods Commonwealth and Washington plan to purchase their entitlements from Transco at a commodity charge approximately 5 cents less than Seaboard's. This will enable Washington and Commonwealth to save $800,000 and $1,000,000 respectively during 1966-1968.
 
 
 16
 Seaboard, however, will not suffer comparable losses. Most of Seaboard's fixed costs are recovered through its demand charge. This is constant regardless of actual deliveries. The commission found that Seaboard's loss from the sales decline to Washington for the two years following October 31, 1966 would be $20,000 or after taxes, $10,000. The corresponding loss with respect to Commonwealth would be about $9,000. The record adequately supports these computations.[5] Seaboard urges that the loss of the entire Columbia system should be added because of the reduced sales of United Fuel, Seaboard's affiliated supplier. The commission determined that annual losses based on the reduction of Washington's sales would amount to $75,000; the reduction for Commonwealth would be slightly less. The evidence does not suggest that these reductions would affect appreciably the Columbia system's financing. In fact, Seaboard introduced no evidence that the reductions would cause it to operate at a loss or require it to raise rates to other customers.
 
 
 17
 Seaboard contends, however, that it is entitled to maintain its status as sole supplier because it historically has served Washington and Commonwealth and enabled them to prosper. More specifically, it points out that its tariff requires it to use "due diligence" to obtain gas and facilities to meet increases in customers' requirements. Transco's tariff has no comparable clause. Additionally, Seaboard points out that its tariffs contain no minimum volumetric purchase requirement. While this has led to the operation of its pipeline on a lower load factor and consequently a higher unit cost than Transco, it has protected Seaboard customers by sharing with them fluctuations in annual sales resulting from weather and economic conditions.
 
 
 18
 Seaboard urges that § 7(f) of the Natural Gas Act[6] grants the commission power to prescribe "service areas amounting to local monopolies" and that the Act discloses no mandate to encourage competition. Seaboard's past service did not require the commission to deny certification of a second supplier, nor does the Act contemplate that a pipeline shall enjoy a monopoly in the area it serves. This is negated by § 7(g).[7] The interpretation of the Act that is urged by Seaboard has not been accepted.[8] In Panhandle Eastern Pipe Line Co. v. FPC, 83 U.S.App.D.C. 297, 169 F 2d 881, 884, cert. denied, 335 U.S. 854, 69 S.Ct. 81, 94 L.Ed. 402 (1948), the court said:
 
 
 19
 "* * * [N]othing in the Natural Gas Act suggests that Congress thought monopoly better than competition or one source of supply better than two, or intended for any reason to give an existing supplier of natural gas for distribution in a particular community the privilege of furnishing an increased supply."
 
 
 20
 Seaboard contends that competition, if allowed, must be limited to incremental sales. It relies on United States v. El Paso Natural Gas Co., 376 U.S. 651, 660, 84 S.Ct. 1044, 1049, 12 L.Ed.2d 12 (1964), where the Court said:
 
 
 21
 "Once the Commission grants authorization to construct facilities or to transport gas in interstate commerce, once the distributing contracts are made, a particular market is withdrawn from competition. The competition then is for the new increments of demand that may emerge with an expanding population and with an expanding industrial or household use of gas."
 
 
 22
 In El Paso the Court was considering the interaction of § 7 of the Clayton Act and the Natural Gas Act. We do not construe its dictum to prescribe an immutable rule for the regulation of pipelines. The Natural Gas Act does not expressly limit a second supplier to incremental sales, and neither the commission nor the courts have imposed such a rigid exclusion. The Act's primary criterion for certification is the public interest.
 
 
 23
 Circumstances exist in which it is not in the public interest to allow a new supplier to divert load from the supplier serving the market. This was the situation in Texas Eastern Transmission Co., 14 FPC 116 (1955), in which the second supplier could provide only a relatively small saving to the distribution company. This case, upon which Seaboard relies, does not establish, however, that the monopoly of a pipeline should be protected when competition would greatly benefit the public and inflict comparatively slight economic detriment upon the pipeline. See Transcontinental Gas Pipe Line Corp., 21 FPC 399, 404 (1959).
 
 
 24
 To the suggestion that the long range effect would be idle capacity and higher costs resulting in a loss of other customers, the commission replied that it did not intend to permit ruinous competition. It observed that the fears expressed by Seaboard and the examiner were speculative and that future proposals to divert gas from the Columbia system or Seaboard would be considered in the light of the most recent information and the circumstances then prevailing.
 
 
 25
 Contrary to Seaboard's assertion, the commission did not ignore the effect of Transco's certification upon markets served by Transco. The commission recognized this as a relevant consideration. Transco's estimated incremental rate of return upon its service to Washington and Commonwealth in 1968 will be 8.71 per cent compared with its system rate of 6.72 per cent. Seaboard has not demonstrated that these estimates are incorrect. While it challenges the prediction that the differential will benefit Transco's other customers, it has not shown any detriment to them. The principal disagreement of the parties lies in the estimate of the storage gas Transco will have for its customers. Transco and others are developing the Wharton Storage Field. The examiner had some doubt that the field as planned can be fully developed, but on the assumption that it could, he found that Transco would have 44,515 Mcf per day of unallocated storage deliverability if service to Washington and Commonwealth were approved. He believed this amount would be needed by Transco's other customers in a relatively short time. The commission adopted the examiner's findings concerning the amount of unallocated storage, but did not agree it was insufficient.
 
 
 26
 The available facts do not permit an unequivocal answer to the ultimate effects upon either Seaboard or Transco and their customers. Often the future is difficult to predict, but uncertainty need not paralyze the commission. It properly exercised a rational judgment based upon an analysis of the whole situation to determine where the public interest lies. United States v. Detroit and Cleveland Nav. Co., 326 U.S. 236, 241, 66 S.Ct. 75, 90 L.Ed. 38 (1945).
 
 III.
 
 27
 Seaboard also contends that the commission violated § 8 of the Administrative Procedure Act [5 U.S.C. § 557 (c)], which requires a statement of the findings, and conclusions and reasons on all material issues. Section 19(b) [15 U.S.C. § 717r(b)] of the Natural Gas Act prohibits a reviewing court from considering an objection to a commission order unless it was urged in the application for rehearing. Respondents protest that Seaboard's failure to charge noncompliance with the Administrative Procedure Act in its petition for rehearing precludes it from objecting now. We do not read Seaboard's petition for rehearing so narrowly. Although the petition did not mention the requirements of the Act, it fairly apprised the commission of Seaboard's objections. Seaboard principally complains that the commission ignored the examiner's finding that the character of its service is worthy of preservation, and that the commission ignored the implication of load diversion. We do not find these deficiencies. The commission accepted the examiner's findings concerning the history of Seaboard's service, and the material facts pertaining to load diversion. Unlike the examiner, it concluded that a second supplier should be introduced into Seaboard's market, and it fully expressed its reasons. The commission's difference with the examiner, and with Seaboard, lies not in the facts, but in the role competition should play. The commission is charged with determining policy on this sensitive issue. Its decision, amply supported by the evidence, does not transgress the Natural Gas Act.
 
 
 28
 Finally, Seaboard suggests the commission was improperly governed by a "net market loss test." The commission said:
 
 
 29
 "While Seaboard would undoubtedly lose some load and would not show as high a rate of growth, we conclude that Seaboard has not proven that such a diversion of load would be detrimental to it and its customers to any significant degree. Furthermore, Seaboard ignores the possibility of off-setting sales elsewhere. Such a test is suggested in Lynchburg Gas Co. v. F. P. C. [119 U.S.App.D.C. 23], 336 F.2d 942, 947 (CADC)."
 
 
 30
 Seaboard asserts that the commission misunderstood Lynchburg to hold that a pipeline's evidence of injury is entitled to no weight unless it will suffer a net market loss. We agree with Seaboard that Lynchburg does not establish such a mechanistic test. The presence or absence of net market loss is not the sole criterion of detriment, but it is a factor the commission may consider in ascertaining the public interest. Cf. The Cincinnati Gas & Elec. Co. v. FPC, 389 F.2d 272 (6th Cir. Feb. 16, 1968). The commission's opinion implies, and the order denying rehearing confirms that a majority of the commission share this view of the test's limited function.[9]
 
 
 31
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 The commission's decision and order are reported in 37 FPC 118, Opinion No. 512 (January 24, 1967). The presiding examiner's decisions are in 37 FPC 137 and 161 (1966). See also 37 FPC 310 (1967) (the commission's order denying Seaboard a stay pending rehearing); and 37 FPC 591 (1967) (order denying rehearing)
 
 
 [2]
 Seaboard's old tariff contained a demand charge of $2.747 per Mcf per month and a commodity charge of 31.5905 cents per Mcf. Its new tariff filed March 31, 1965 has a demand charge of $3.12625 per Mcf per month and a commodity charge of 28.372 cents per Mcf. The new tariff also contains a winter service schedule for gas from storage with a demand charge of $1.28125 per Mcf per month and a commodity charge of 1.64 cents per Mcf. Seaboard's tariff does not contain a minimum commodity, or volumetric purchase, requirement. The commission took cognizance of proposed settlement rates which would represent further reductions on the part of Seaboard
 Transco's old rates, in effect when the hearings began on January 1, 1965, contained a demand charge of $3.30 per Mcf per month and a commodity charge of 23.3 cents per Mcf. The rate when the case was reviewed by the commission was reduced to a demand charge of $3.13 per Mcf per month and a commodity charge of 22.7 cents per Mcf. Transco had a 65% minimum volumetric limitation.
 
 
 [3]
 The peaks and valleys of Washington's demands are illustrated by 1969 estimates. Its average daily requirements then will approximate 250,000 Mcf, while its peak during the winter is estimated at 868,000 Mcf, or a difference of 618,000 Mcf peaking needs. The commission estimated that Washington's peak shaving facilities and its underground storage capacity would be a little less than 300,000 Mcf. This, of course, would not balance Washington's requirements. Storage or winter service from the pipelines, the commission concluded, would be particularly useful to Washington
 
 
 [4]
 Load factor is the ratio of average daily purchases for the year to peak day purchases
 
 
 [5]
 The examiner found the fixed cost contained in the commodity component of Seaboard's new tariff was approximately 0.5 cents. The commission computed that under Seaboard's proposed settlement rates approved after the decision under review, which included in the commodity charge 1.14 cents per Mcf of fixed charges, the loss over the same period would be approximately $43,000 after taxes. The commission noted this was in no way comparable to the substantial benefits which would accrue to Washington, Commonwealth, and their customers
 
 
 [6]
 Section 7(f) [15 U.S.C. § 717f(f)] provides:
 "The Commission, after a hearing had upon its own motion or upon application, may determine the service area to which each authorization under this section is to be limited. Within such service area as determined by the Commission a natural-gas company may enlarge or extend its facilities for the purpose of supplying increased market demands in such service area without further authorization."
 
 
 [7]
 Section 7(g) [15 U.S.C. § 717f(g)] provides:
 "Nothing contained in this section shall be construed as a limitation upon the power of the Commission to grant certificates of public convenience and necessity for service of an area already being served by another natural-gas company."
 
 
 [8]
 Certification of two or more suppliers is common. They may be found in the metropolitan areas of Atlanta, Chicago, Cleveland, Detroit, Los Angeles, New York, Philadelphia, Pittsburgh and San Francisco
 
 
 [9]
 Commissioner Carver, concurring, believedLynchburg requires the commission to measure a pipeline's detriment by the net market loss test. He deplored the test's regulatory inflexibility and called for its re-examination.