The DAYTON POWER AND LIGHT
COMPANY, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Buckeye Power, Inc.; American Munici-
pal Power–Ohio, Inc.; and City of St.
Marys, Ohio, Intervenors for Respon-
dent.

No. 87–3173.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 26, 1988.

Decided April 5, 1988.

Richard M. Merriman, Robert S. Waters, John D. McGrane (argued), Joseph J. DiMona, Reid & Priest, Washington, D.C., Stephen F. Koziar, Jr., Edward N. Rizer, The Dayton Power & Light Co., Dayton, Ohio, for petitioner.

Hanford O'Hara (argued), Thomas Blackburn, John H. Conway, F.E.R.C., Office of the Solicitor, Washington, D.C., for respondent.

David R. Straus, Marc Poirier, Ben Finkelstein (argued), Spiegel & McDiarmid, Washington, D.C., for intervenor for respondent American Mun. Power–Ohio and City of St. Marys, Ohio.

Robert P. Mone, William R. Case, Thompson, Hine & Flory, Columbus, Ohio, for intervenor for respondent Buckeye.

Before MILBURN and GUY, Circuit Judges, and CONTIE, Senior Circuit Judge.

RALPH B. GUY, Jr., Circuit Judge.

Dayton Power and Light Company (DP & L), an investor-owned public utility, petitions for review of orders issued by the Federal Energy Regulatory Commission (FERC or the Commission), requiring DP & L to transmit power generated by Buckeye Power, Inc., to the City of St. Marys, Ohio, under the terms of a 1968 "wheeling" contract. DP & L contends that it did not agree to deliver the power now ordered by the Commission. Because we agree with FERC's determination that DP & L is contractually bound to deliver the power, we affirm.

I.

Intervenor Buckeye Power, Inc. (Buckeye), is a non-profit electric generation and transmission cooperative incorporated under the laws of the state of Ohio. Buckeye provides wholesale electric service to its twenty-nine members who constitute all of the electric cooperatives engaged in the sale of electricity within the state of Ohio. These twenty-nine Buckeye cooperative members are themselves non-profit utility corporations, created for the purpose of providing electric service to their own respective members, who, in accordance with basic cooperative principles, own and control these cooperatives, just as these twenty-nine cooperatives own and control Buckeye. The Buckeye member cooperatives act jointly through Buckeye to generate and transmit electricity, and to construct, own, contract for, and maintain necessary facilities for this purpose. In addition, several of the Buckeye member cooperatives sell electricity at wholesale to municipal customers. Intervenor American Municipal Power–Ohio, Inc. (AMP–Ohio), is a non-profit Ohio corporation whose membership consists of municipal electric systems. AMP–Ohio buys electric power from Buckeye members for resale to its own municipal members. Intervenor City of St. Marys, Ohio (St. Marys), operates a municipal electric utility and buys electric power from both AMP–Ohio and petitioner DP & L.

On January 1, 1968, Buckeye entered into a contract, the Power Delivery Agreement (PDA or the Agreement), with several investor-owned utilities, including DP & L.[1] These utilities, described in the PDA

---

1. The other investor-owned utilities named in the contract were the Cincinnati Gas & Electric Company, Columbus and Southern Ohio Electric Company, Monongahela Power Company, Ohio Power Company, and the Toledo Edison Company.

as "Delivery Companies,"[2] agreed that for a period of thirty-five years they would "wheel," i.e., transmit over their own lines, power generated by Buckeye[3] to the cooperative members that then comprised Buckeye. The PDA provides for the transmission and delivery of the "Buckeye Power Requirement" to Buckeye's members over the transmission lines of the delivery companies. Buckeye Power Requirement is defined in section 1.1 of the PDA as follows:

> [T]he aggregate requirements of Buckeye for electric power and energy from time to time for sale and delivery to the Buckeye Members and for resale and delivery by the Buckeye Members to customers in the State of Ohio for ultimate consumption within the State of Ohio or use by the Buckeye Members within said State in the operation of their respective facilities and systems; provided, however, that consistent with the desire and objective of all parties to minimize any unnecessary or uneconomic duplication of facilities, *there shall not be included in the Buckeye Power Requirement any quantity of electric power and/or energy furnished to any consumer when the furnishing of power and/or energy to such consumer by a Buckeye Member is proscribed by the law of the State of Ohio reflected in Section 4905.26.1, Revised Code of Ohio, as said Section is in effect at the date of this Agreement.* It is understood and agreed that the term "consumer" as used in Section 4905.26.1 applies to any customer of a power and/or energy supplier whether served at wholesale or at retail.

(Emphasis added). The Ohio statutory provision referred to in the definition of Buckeye Power Requirement was commonly known at the time of the negotiation and execution of the Agreement as the "anti-pirating" law. As of the date the Agreement was executed, that statutory provision stated in relevant part:

> Whenever a public utility proposes to furnish or furnishes electric energy to a consumer and which consumer is being furnished or was being furnished electric energy by another public utility, the latter public utility may file a complaint *with the public utilities commission* protesting the furnishing of service by the other public utility. Such complaint shall be filed within ninety days from the date the public utility which is furnishing electric energy discovers that another utility proposes to furnish the consumer with electric energy. In the event a consumer has been disconnected from the lines of a public utility, and electric energy has not been furnished said consumer for a period of more than ninety days, no right to file a complaint shall accrue under this section. *The commission upon finding that the complaining public utility has been furnishing or will furnish an adequate service to such consumer and that the public utility complained against will duplicate facilities of the complainant, shall order the public utility complained against not to furnish electric energy to such consumer.*

Ohio Rev.Code Ann. § 4905.26.1 (Anderson 1977) (*repealed* 1978) (emphasis added).

Prior to agreement on the contractual language quoted above, the parties were involved in a lengthy negotiations process. Initially, Buckeye had taken the position that its right to call upon the delivery companies to wheel power within the state of Ohio was essentially unlimited. In 1966, however, after negotiations on the rate pro-

---

**2.** The delivery companies operate their own generation, transmission, and distribution facilities throughout Ohio. Their transmission facilities are directly or indirectly interconnected and thus form a means by which Buckeye Power may be transmitted throughout the state.

Prior to the commencement of Buckeye's operations in 1968, the Buckeye members had purchased all of their power and energy requirements directly from these investor-owned utilities pursuant to wholesale power agreements.

**3.** Buckeye generates power and energy for its cooperative members at the Cardinal Station, a two-unit coal-fired steam electric generating station located near Brilliant, Ohio.

visions [4] had been concluded, the delivery companies raised the concern that the Agreement might be used by Buckeye and its members to serve large loads, especially municipal loads, that were at that time customers of the delivery companies. Buckeye was thereafter advised by Ohio Power Company [5] that the delivery companies required inclusion of a restriction in the Agreement which would render Buckeye members unable to serve the municipal utility customers of the delivery companies. As a result of the demands made by the delivery companies, on May 22, 1967, a definition of Buckeye Power Requirement, which essentially excluded the provision of electric power to municipalities not already served by Buckeye members,[6] was filed with the Federal Power Commission (FPC).[7] In response to this filing, however, the Ohio Municipal Electric Association and the American Public Power Association protested the Agreement's restriction on resale to municipalities.

Based in great part on the fact that Ohio Power informed Buckeye that the entire project might fail if the Commission upheld the protestors' objections, in a letter dated June 29, 1967, Buckeye responded to the arguments presented by the protestors, and attempted to persuade the FPC to accept the restrictions. On July 3, 1967, Ohio Power filed with the Commission a notice indicating that, absent complete approval of the filed Agreement, its application for approval of the arrangements constituting the Buckeye Project would be withdrawn.

On August 4 and 28, 1967, the FPC issued orders in which it refused to approve the lawfulness of the Agreement as a rate schedule under the Federal Power Act, 16 U.S.C. § 824, *et seq.*, in part because of the objections made to the restrictions in the definition of Buckeye Power Requirement.

4. Under the terms of the Agreement, Buckeye makes a single payment to the delivery companies collectively for transmission of its power on their transmission facilities. The monthly delivery service payment is the product of a dollars-per-kilowatt charge, and the "Buckeye System Peak Demand" applicable through the month. The Buckeye System Peak Demand is the maximum coincident hourly demand established at all rural electric cooperative delivery points during the month or any proceeding month during the term of the Agreement. This payment is then divided among the delivery companies on the basis of the allotment procedures contained in article nine of the Agreement. Thus, as long as the total demand imposed by Buckeye on the transmission facilities of the delivery companies in any month does not exceed the maximum demand previously established, the monthly payment by Buckeye for transmission services remains unchanged.

5. Ohio Power's involvement in the Buckeye Project was greater than that of the other delivery companies. Therefore, Ohio Power often took a leading role on behalf of the other delivery companies, including DP & L, in the negotiations with Buckeye on the PDA.

6. That definition of the Buckeye Power Requirement, filed with the FPC in conjunction with the joint application of Buckeye and Ohio Power for approval of all major contracts creating the Buckeye project, provided as follows:

[C]onsistent with the desire and objective of all parties to avoid any unnecessary or uneconomic duplication of facilities, there shall not be included in the Buckeye Power Requirement (a) any quantity of electric power and/or energy for resale to or use by a municipality any portion of whose electric service (excepting emergency service) is being provided, at the date of this Agreement or at any time thereafter, by any Company, except to the extent that electric service to any such municipality has been previously established and is still being provided, at the time in question, by a Buckeye Member or is to be provided to a municipal installation located exclusively within the service area of a Buckeye Member, or (b) any quantity of electric power and/or energy which is to be sold and/or delivered by any Buckeye Member to any installation of electrically connected facilities owned and/or operated by any political subdivision of the State of Ohio, or any municipal corporation, and any bureau or department organized by or serving any such political subdivision or any such municipal corporation, or any other governmental agency, or any successor to any of the foregoing, if such installation, at the effective date of this Agreement or thereafter, shall have been supplied with power and/or energy by any Company (except for agreed upon emergency and/or temporary service) unless such installation shall have been disconnected from the lines of such Company, and electric energy shall not have been furnished to such installation for a period of more than ninety days (excluding from such period any day or days on which such installation shall not have been in operation).

7. The FPC was the predecessor to the Federal Energy Regulatory Commission.

Accordingly, the delivery companies refused to allow the Agreement to go into effect. Buckeye and the delivery companies then attempted to obtain approval of the Agreement from the United States Department of Justice under the department's Antitrust Business Review Procedure. The Justice Department refused, however, to approve the definition of Buckeye Power Requirement that had been submitted to the Commission.

Buckeye and the delivery companies then proposed a substitute definition of Buckeye Power Requirement in which the previous restriction concerning sales to municipalities would be deleted and replaced with a less restrictive limitation on the ability of Buckeye to compel the wheeling of its power to municipalities under the PDA. The parties accomplished this revision by incorporating into their Agreement the Ohio anti-pirating law as in effect on the date of the Agreement. The Department of Justice thereafter agreed to provide a letter of clearance for the Agreement.[8] In view of the Justice Department's approval, the FPC stated that it would accept the Agreement for filing as a rate schedule under the Federal Power Act. The Agreement became effective pursuant to its terms as of January 1, 1968.

In July of 1978, the Ohio anti-pirating statute was repealed. Thereafter, in late 1980, St. Marys requested that DP & L deliver Buckeye power to St. Marys via a Buckeye member cooperative under the terms of the PDA. DP & L refused, claiming among other things that St. Marys was not entitled to the requested service under the Agreement. Subsequently, in March of 1981, DP & L instituted its own "Original Volume No. 2" tariff which was wholly separate from the PDA and which provided St. Marys and other municipalities with delivery service from various suppliers other than DP & L, including Buckeye. The rates under the DP & L tariff were higher than those under the PDA.

In April, 1981, St. Marys and AMP–Ohio filed a complaint with the Commission under section 306 of the Federal Power Act, 16 U.S.C. § 825e, alleging that DP & L had violated its obligations to transmit power under the Agreement.[9] In May, 1982, the Commission issued an order in which it interpreted the PDA as requiring DP & L to provide the wheeling service to St. Marys under the terms of the PDA. DP & L sought judicial review of the Commission's decision. In December, 1982, while that appeal was pending before this court, the Commission requested remand to allow it to reconsider issues raised by DP & L, particularly DP & L's contention that reference in the PDA to the Ohio anti-pirating statute allowed DP & L to refuse to deliver power to St. Marys under the Agreement. The case was remanded and proceedings were commenced before an administrative law judge (ALJ).

In December, 1983, the ALJ issued his initial decision in the matter, finding that the language of the Ohio anti-pirating statute permitted DP & L to refuse St. Marys' request to have DP & L wheel power from Buckeye to St. Marys under the Agreement.[10] Buckeye, St. Marys, AMP–Ohio,

---

8. This letter indicated that the Justice Department had no current intention to bring any antitrust proceedings.

9. During this time period, Buckeye filed a complaint with the Commission against Cincinnati Gas & Electric Company (CG & E) alleging that CG & E had violated the PDA by refusing to deliver Buckeye power to another municipal customer pursuant to the PDA. The Commission ordered CG & E to provide service under the PDA, but the Commission did not address the anti-pirating provision of the Agreement. This court set aside and remanded the Commission's order on grounds not involving the anti-pirating provision. *Cincinnati Gas & Electric Co. v. FERC,* 724 F.2d 550 (6th Cir.1984).

10. With regard to the duplication of facilities issue, DP & L had argued that in accordance with the terms of its Original Volume No. 2 tariff, DP & L had provided for certain transmission services which could be used by St. Marys, but *not* Buckeye. Therefore, DP & L argued, because Buckeye did not have the use of DP & L facilities to provide power to St. Marys under either the tariff or the PDA, Buckeye would have no other means by which to transmit the power and would have to construct such facilities. Therefore, the argument concluded, Buckeye was barred by the terms of the anti-pirating statute, as incorporated in the PDA, from compelling DP & L to wheel power to St. Marys since, in order to accomplish that objective, Buckeye would have to duplicate the facilities of

DP & L, and the Commission's trial staff appealed the ALJ's decision to the Commission, each respectively taking issue with certain portions of the opinion.

Buckeye, St. Marys, AMP–Ohio, and the Commission staff argued that the repeal of the anti-pirating statute rendered all prohibitions of the PDA based on that statute null and void on the ground that those prohibitions were non-severable from the role of the Ohio Public Utilities Commission (Ohio PUC) in deciding questions of duplication of facilities and adequacy of service. Since such determinations were by virtue of repeal no longer available, these parties contended that DP & L could no longer lawfully rely on the anti-pirating provision in any manner to avoid DP & L's duty to furnish requested delivery service. Alternatively, on the duplication of facilities issue, these parties argued that because DP & L's delivery of Buckeye power to St. Marys would be achieved via existing delivery facilities of DP & L, there was no need to construct any duplicative facilities, and therefore, DP & L's delivery obligation continued.

DP & L, on the other hand, claimed that the legislative repeal of the anti-pirating statute in no way affected the rights and obligations of the parties under the terms of the PDA which retained, via incorporation, the terms of the repealed statute. DP & L argued further that the ALJ had properly concluded that the proposed transmission of Buckeye power to St. Marys under the PDA would result in a duplication of facilities barred by the Ohio anti-pirating statute.

In its December 30, 1986, order requiring service, the Commission agreed with DP & L that the intent of the parties was to continue the effectiveness of the anti-pirat-

ing provision beyond any repeal of the statute itself.[11] Accordingly, the Commission stated that for DP & L to have fully complied, it should have filed a complaint with the Commission alleging duplication of facilities resulting from the proposed transmission of Buckeye power to St. Marys. It excused that failure in this case, however, in light of all the circumstances, but declared that delivery companies would be required to file such complaints when similar disputes arose under the PDA in the future. With regard to the duplication of facilities issue, the Commission concluded that no such duplication would occur as the result of the requested delivery of power from Buckeye to St. Marys, and reversed the ALJ's decision on this issue.

The Commission then raised and addressed, *sua sponte*, the issue of whether DP & L may surcharge the Original Volume No. 2 tariff rate for past transportation of Buckeye power in light of this court's decision in *Cincinnati Gas & Electric v. Federal Energy Regulatory Commission*, 724 F.2d 550 (6th Cir.1984). In *Cincinnati Gas*, this court determined that Buckeye Member Cooperative, Inc. (BMCI), established to transact sales for resale of Buckeye power to AMP–Ohio and the AMP–Ohio municipal members, did not meet the PDA definition of a Buckeye member cooperative. Finding, therefore, that the service requested in that case could not be required under the PDA, this court remanded the case to allow the Commission to rule on certain questions concerning the appropriate rate for service provided outside of the terms of the PDA. On remand of that case, the Commission had determined that surcharges by the delivery companies for past service through BMCI

DP & L. In finding that Buckeye was barred from compelling DP & L to wheel Buckeye power to St. Marys, the ALJ adopted this argument.

11. Under the Ohio statute, a procedure was detailed whereby upon a finding by the Ohio PUC that service proposed by a new supplier would duplicate facilities of an existing utility that is furnishing adequate service to the consumer, such new service would not be allowed to go into effect. The Commission found that a prior

determination of the statutory criteria by an impartial agency was an integral part of the statute's purpose, preventing unnecessary and uneconomic duplication of electric facilities. In light of the legislative repeal of the statute, FERC determined that FERC itself was an appropriate impartial agency to replace the Ohio PUC in making these determinations. On appeal, the parties do not take issue with this determination.

were not appropriate. In the order requiring service issued in the instant case, the Commission reiterated this determination. DP & L sought rehearing. Upon rehearing, the Commission rejected DP & L's argument, and held further that where a complaint involving the PDA is resolved in favor of a delivery company, neither Buckeye nor its customer will be held liable for a surcharge for transmission service rendered by the delivery company under the PDA rate pending resolution of the complaint by the Commission.

DP & L now seeks review of the Commission's order requiring service and its order on rehearing. Jurisdiction is invoked under 16 U.S.C. § 825*l*(b). 37 F.E.R.C. ¶61,311 (1986); 38 F.E.R.C. ¶61,175 (1987). On appeal, DP & L argues that the Commission improperly ordered DP & L to provide transmission of Buckeye power to St. Marys under the PDA because (1) such service was not intended by the parties to the PDA, and (2) such service would result in a duplication of facilities in contravention to the terms of the PDA. DP & L claims further that the procedures established by the Commission for the resolution of future disputes are inconsistent both with the Commission's limited authority and with the terms of the Agreement. Finally, DP & L claims that the Commission erroneously determined that DP & L was not entitled to reimbursement from St. Marys and the other municipal electric systems for services provided through BMCI.

## II.

In its previous examination of the instant Agreement, this court outlined the appropriate standard of review as follows:

> In reviewing the Commission's interpretation of the language of the Agreement, we are not bound to defer to the FERC's determination. Under general contract law, interpretation of a contract is a question of law, not fact. "Ques-

tions of law, unlike questions of fact, are fully reviewable by the court." An agency's interpretation of a contract, therefore, may be reviewed by a court without special deference. It should be noted that courts do defer to contract interpretations based upon an agency's factual findings or technical expertise. In this case, however, where the FERC based its decision on the language of the Agreement rather than any factual or technical grounds, this Court need not defer to the Commission's interpretation but can review it freely.

*Cincinnati Gas,* 724 F.2d at 554 (citations omitted). During the period since the *Cincinnati Gas* decision, the Supreme Court has elaborated upon the areas in which deference is to be applied to certain agency determinations. *Chevron U.S.A., Inc., v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694, *reh'g denied,* 468 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (1984). In *Chevron,* the Court stated:

> If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

*Id.* at 843–44, 104 S.Ct. at 2781–82 (footnotes omitted). Therefore, in addition to the standards set forth in *Cincinnati Gas,* we note that where an agency is delegated, either explicitly or implicitly, to interpret a statute, the construction it gives to that provision is controlling if it is reasonable.[12]

---

12. While we specifically refrain from adopting the position here, we note that the District of Columbia Circuit Court has interpreted the holding of *Chevron* to modify "'the traditional rule of withholding deference on questions of contract interpretation.'" *Vermont Dept. of Pub. Serv. v. F.E.R.C.,* 817 F.2d 127, 135 (D.C.Cir. 1987) (quoting *National Fuel Gas Supply Corp. v. F.E.R.C.,* 811 F.2d 1563, 1570 (D.C.Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987) (emphasis added).

*See also Kentucky Utilities Co. v. United States Federal Energy Regulatory Commission,* 766 F.2d 239, 242 (6th Cir.1985).

### A. DP & L's Obligation to Wheel Buckeye Power to St. Marys Under the PDA

On appeal, the parties do not take issue with the Commission's determination that the incorporation of the anti-pirating provision in the PDA survives the repeal of that statute. Rather, the primary issue before us is whether the challenged transmission by DP & L of Buckeye power to St. Marys is within the PDA's definition of Buckeye Power Requirement. This issue must be analyzed in two respects: first, whether the parties to the PDA intended this transmission service to fall within the scope of the Agreement; and, second, whether provision of the challenged transmission service would result in an improper duplication of facilities in contravention of the terms of the anti-pirating statute.

### 1. The Intent of the Parties

A determination of the intent of the parties is critical to a determination of the legal significance of their agreement. This presents a mixed question of fact and law which is subject to *de novo* review. *Cordovan Associates v. Dayton Rubber Co.,* 290 F.2d 858, 860 (6th Cir.1961).

■ DP & L argues that the parties to the Agreement specifically intended that the Agreement's reference to the Ohio anti-pirating law would effectively limit the obligation of the delivery companies to provide Buckeye power to the municipal customers of the delivery companies. In support of its argument, DP & L points to the negotiations process which led up to the signing of the Agreement. Specifically, DP & L relies on the June 29, 1967, letter from Buckeye to the FPC in which Buckeye attempted to persuade the FPC to accept the restrictive language proposed by the delivery companies.

FERC, on the other hand, argues that the challenged transmission service falls within the scope of the Agreement in accordance with the original intent of the parties. Like DP & L, FERC points to the negotiations process to support its argument that the parties understood that transmission of Buckeye power to municipalities, such as St. Marys, was not to be excluded under the PDA. Specifically, FERC cites the December 19, 1967, letter from the Department of Justice providing clearance of the PDA as modified to include the Ohio statutory anti-pirating provision. That letter stated in pertinent part as follows:

> Under the contracts Buckeye Member is defined so as to exclude from membership Ohio municipalities and municipal electric power systems. You have represented to us that at present Section 743.-28 of the Revised Code of Ohio forbids municipalities from entering wholesale power contracts for longer than 10 years, effectively precluding them from Buckeye membership because of inability to participate in the 35–year contractual arrangement required of Buckeye members under the project. *However, you have stated that a municipality is in no way precluded under the contracts from becoming a member of one of the Buckeye member cooperatives.*
>
> As originally submitted, the Station and Power Delivery Agreements contained definitions of Buckeye Power Requirement which, in effect, would exclude many municipalities as customers of Buckeye members. The definition of Delivery Points Energy in the Ohio Edison Agreement would have the same effect. However, at the December 14, 1967 meeting, you proposed an amended definition, attached hereto as Appendix I, which upon agreement of the other parties to the Buckeye Project would be substituted in the Station and Power Delivery Agreements and to which the definition of Delivery Points Energy in the Ohio Edison Agreement would be conformed. *You have represented that the effect of the amendment would be to restrict sales by Buckeye members to municipalities only insofar as the present Section 4905.26.1 of the Revised Code of Ohio would restrict such sales.*

(Emphasis added). In view of this Justice Department approval, the FPC had stated

that it would accept the Agreement for filing as a rate schedule under the Federal Power Act.

In its letter approving the final version of the Agreement, the Justice Department specifically relied on (1) the delivery companies' representation that the agreement did not in any way preclude a municipality from becoming a member of one of the Buckeye member cooperatives, and (2) the representation that the Agreement would restrict sales by Buckeye members to municipalities only to the extent that the incorporated anti-pirating statute would restrict such sales. In the absence of those representations, the parties would not have obtained approval of the Agreement. This is evidenced by the fact that the Justice Department and the Commission had rejected the previously proposed Agreement, the terms of which greatly restricted transmission of Buckeye power to municipalities. In response to the Justice Department's letter, the delivery companies did not deny that they had made the representations outlined in the Department's letter above. Through their silence, the delivery companies evidenced their acquiescence in the Department's demands.

Further, we are not persuaded by DP & L's reference to Buckeye's statements in its December 18, 1967, letter to the FPC. Upon review of the events leading up to the submission of the letter, it becomes clear that Buckeye defended the previous and more restrictive version of the PDA due primarily to the threat of the delivery companies to withdraw from the Agreement completely unless that version of the PDA became effective. Upon review of the language of the PDA and the events leading up to its creation, we find that, when the PDA in its present form became effective, the parties intended that Buckeye *could* require the delivery companies to wheel power to a municipality such as St. Marys, *unless* the Ohio PUC determined that such service was barred by the anti-pirating provision.

### 2. *The Effect of the Anti-pirating Provision*

█ The repealed Ohio anti-pirating statute permitted a public utility to object to proposed service by a second public utility to a customer of the first utility if (1) the first utility had been providing adequate service to the customer, and (2) the second utility would duplicate facilities of the first utility in providing the proposed service. Where the Commission finds that the service provided by the first company is inadequate, or that duplication of facilities will not occur, the Commission will not interfere with the challenged competition for consumers.

The adequacy of the service provided to St. Marys by DP & L is not challenged. At issue is whether the delivery of Buckeye power to St. Marys, over the transmission lines of DP & L, would result in a "duplication of facilities" under the anti-pirating statute.

The Commission ultimately concluded that the challenged transmission of Buckeye power to St. Marys, over the lines of DP & L, would not result in a duplication of facilities and therefore was not barred by the PDA. In so concluding, the Commission determined that, under the terms of the anti-pirating provision, duplication of facilities does not occur where there already exists another means to transmit the power in question. The Commission observed that DP & L had already been transmitting Buckeye power in limited quantities to St. Marys under DP & L's Original Volume No. 2 transmission tariff between May of 1981 and May of 1982 (the latter date marking the point at which the Commission initially ordered the service to continue under the PDA rate). The Commission was also aware that the access to DP & L's system for delivery of Buckeye power to St. Marys was available, under the DP & L's Original Volume No. 2 tariff, to St. Marys and not to Buckeye. The Commission reasoned, however, that whether the tariff was available to Buckeye was irrelevant since all that was required to avoid duplication of facilities under the anti-pirating provision was that "another means exist[ed] to transmit the power." In so holding, the Commission stated:

[I]f we accepted the narrow reading of the "other means" requirement imposed by the interpretation of the contract suggested by the [administrative law] judge and DP & L, the Delivery Companies would achieve a result, *i.e.,* the preclusion of Buckeye from serving municipal customers, that the Federal Power Commission and the Justice Department foreclosed them from reaching with their original power requirement restriction.

(Footnote omitted).

On appeal, DP & L claims that the Commission's analysis is "boot-strap" in nature and leads to a result which was not intended by the parties to the agreement. Specifically, DP & L argues that as a result of the Commission's analysis, any municipality, such as St. Marys, can enlarge the rights of Buckeye under the PDA to compel transmission service by the delivery companies. This expansion of the delivery companies' obligation under the PDA can be accomplished, DP & L argues, by a municipality's act of simply signing up for, but never using or intending to use, power provided under the Original Volume No. 2 tariff. Instead, according to DP & L, the facilities which exist and transmit Buckeye power to St. Marys under the Original Volume No. 2 tariff must be *ignored* when determining whether Buckeye must construct duplicate facilities to accomplish the transmission of service to a municipality such as St. Marys. Therefore, the argument concludes, in the instant case where the Original Volume No. 2 tariff is the only existing means of transmitting Buckeye power to St. Marys and this single existing means of transmission is not available *to Buckeye,* Buckeye would have to build duplicative facilities in order to accomplish the transmission to St. Marys and, therefore, the transmission is barred by the anti-pirating provision.

Initially, we note that the Supreme Court's recent decision in *Chevron* directs us to defer to an agency interpretation of a statutory provision where that interpretation is reasonable and not inconsistent with the statute or its legislative history. *Chevron,* 467 U.S. at 844–45, 104 S.Ct. at 2782–83. In the instant case, the Commission

interpreted the duplication of facilities language of the Ohio anti-pirating statute to require only an inquiry into whether "another means exists to transmit the power." According to this interpretation, where such an alternate means is found to exist, no duplication of facilities is required, and the proposed transmission is not barred by the anti-pirating statute. In challenging the Commission's interpretation of this language, DP & L fails to cite any inconsistencies between this interpretation and either the overall meaning of the statute or the legislative history of the statute. We find that no such inconsistencies exist, and that the Commission's interpretation of the language in question is reasonable. Therefore, because the Original Volume No. 2 tariff has provided "another means ... to transmit" Buckeye power to St. Marys, the challenged transmission is not barred by the duplication of facilities language of the Ohio anti-pirating statute, as reasonably interpreted by the Commission.

B. Procedures Established by the Commission for the Resolution of Future Disputes

In its order requiring service, the Commission established the following procedures for the resolution of future similar disputes arising under the PDA:

In all future cases involving requests for service which the Delivery Companies feel are barred by the terms of the [anti-pirating] provision, the companies will be required [within 90 days of Buckeye's request for service] to seek an interpretation of the contract with this Commission before denying service. During the period that the complaint is before the Commission, the Delivery Company will be required to perform the service at the PDA rate, subject to reimbursement by Buckeye at the rate level of any company tariff applicable to such wheeling service.

(Footnote omitted). On rehearing, the Commission retained the requirement that (1) the complaining delivery company seek an interpretation by the Commission within ninety days of the discovery that Buckeye

seeks to compel transmission under the PDA, and (2) the delivery company must perform the disputed service at the PDA rate pending the Commission's resolution of the issue. However, the Commission reversed its determination that where the delivery company ultimately prevails, Buckeye must reimburse it for service that was provided at the PDA rate pending the Commission's ultimate resolution of the dispute. In so concluding, the Commission reasoned that since the PDA itself does not speak to or require reimbursement, and since the Federal Power Act provides for only prospective relief, no reimbursement on the part of Buckeye is required.[13]

■ In the instant case, the Commission determined, and we agree, that DP & L was bound to deliver Buckeye power to St. Marys under the PDA. Therefore, the question of whether Buckeye must reimburse a delivery company which prevails before the Commission is not a question properly raised before this court.[14]

■ We do find, however, that the requirement that a delivery company seek a determination by the Commission before denying service requested by Buckeye, and the requirement that the delivery company provide the service in question under the terms of the PDA pending the Commission's decision, are reasonable procedures

established by the Commission to carry out its administrative function. We therefore uphold the Commission's decision to adopt these procedures to accomplish the resolution of future similar disputes arising under the PDA.

### C. Reimbursement to DP & L for Service Rendered Under the PDA to BMCI

■ In its order requiring service, the Commission raised the issue of whether DP & L was entitled to reimbursement for service provided through BMCI. The Commission determined that DP & L was not entitled to surcharges at the tariff rate for past transmission service of Buckeye power through BMCI. In reaching its conclusion, the Commission pointed out that DP & L's original refusal to serve was not based on the fact that BMCI was to be used as the conduit for service.[15] DP & L's refusal was based on its reading of the anti-pirating provision. In light of the fact that proper Buckeye members listed in the Agreement could have performed the service (and now do perform that service) which BMCI performed, the Commission determined that DP & L was not injured as the result of the use of BMCI and that, therefore, DP & L suffered no damages. Because we find that the decision of the Commission on this issue is well reasoned

---

**13.** *But cf. United Gas Improvement Co. v. Callery Properties, Inc.,* 382 U.S. 223, 229, 86 S.Ct. 360, 364, 15 L.Ed.2d 284 (1965), *reh'g denied,* 382 U.S. 1001, 86 S.Ct. 526, 15 L.Ed.2d 491 (1966): While the Commission "has no power to make reparation orders" ... it is not so restricted where its order, which never became final, has been overturned by a reviewing court. Here the original certificate orders were subject to judicial review; and judicial review at times results in the return of benefits received under the upset administrative order. An agency, like a court, can undo what is wrongfully done by virtue of its order.
(Citations omitted).

**14.** We note, however, that we are troubled by the position which the Commission seems to take regarding reimbursement. The issue of reimbursement arises as a result of the Commission's determination to require the delivery companies to provide transmission service under the PDA rate pending resolution of disputes brought before the Commission.
Upon review of the various Commission orders issued in this case, it appears that in the

event that Buckeye or the party seeking delivery of Buckeye power prevails, the Commission requires the delivery company to reimburse its customers (who have made payments under a private tariff rate) for the difference between the tariff and the PDA rates. On the other hand, however, where it is the delivery company that prevails, the Commission does not require Buckeye or its customers to reimburse the delivery company for the difference between the PDA rate paid during the pendency of the action and the tariff rate which is ultimately found to apply. The rationale for this disparity in treatment of the prevailing party to a dispute arising under the PDA is not immediately apparent.

**15.** In its order requiring service, the Commission noted: "In the request to DP & L for a delivery point to serve St. Marys, the Buckeye member cooperative through which service was to be channeled was not specified, although Buckeye later elected to have service performed through BMCI."

and well supported by the facts, we AF-FIRM.